**STATE of Missouri, Respondent,**

v.

**Louis WALLACH, Appellant.**

**No. 50633.**

Supreme Court of Missouri,

Division No. 1.

March 8, 1965.

Motion for Rehearing or for Transfer to Court En Banc Denied April 12, 1965.

Thomas F. Eagleton, Atty. Gen., Louis C. DeFeo, Jr., Asst. Atty. Gen., Jefferson City, for respondent.

Mortimer A. Rosecan, St. Louis, for appellant.

HENLEY, Judge.

Indicted for murder in the first degree (§ 559.010), defendant was tried by a jury, convicted of manslaughter and sentenced to a term of ten years (§ 559.140) in the custody of the Department of Corrections. (References to Statutes and Rules are to RSMo 1959 and V.A.M.S., and V.A.M.R., respectively.) He was represented by counsel in the trial court and is represented by the same counsel on appeal.

Defendant raises seven points for review in his brief, namely: (1) that the verdict of guilty of manslaughter violates the due process clause of the Constitution of Missouri and that clause of the Constitution of the United States in that he was con-

victed of a crime for which there was no evidence and of which he is innocent as a matter of law; (2) that the court erred in refusing to permit him to read to the jury portions of depositions of the state's chief witness (Officer Jon Becker) allegedly inconsistent with the witness' trial testimony; (3) that the court erred in prohibiting defendant from commenting upon or drawing an unfavorable inference from the failure of the state to produce as a witness one Lieutenant Duke in corroboration of portions of the trial testimony of Officer Becker, and that the court compounded this error by telling the jury Duke was equally available to defendant; (4) that the court erred in failing to instruct the jury that defendant had the right to prevent his place of business from being robbed and the right to shoot and kill, if necessary, to prevent the commission of that felony on his premises; (5) that the court erred in refusing to give to the jury proper instructions submitting his defense that he did not know that he was shooting at Elmer Otto McCormack and would not have shot had he known; (6) that the court erred in giving instruction No. 3 because it failed to require a finding defendant knew it was McCormack at the time he shot him, that it assumed defendant knew it was McCormack and it thereby disparaged the entire theory of the defense; and, (7) that the court erred in giving instruction No. 3 for the further reason it limited justifiable homicide to the killing of another in lawful defense of his person or in resisting an attempt to commit a felony upon him. Points (4) and (7) may logically, and will be, considered together, as will points (5) and (6).

In the unlighted interior of defendant's place of business late on the cloudy morning of October 29, 1962, defendant, Louis Wallach, shot and killed his alleged friend, Elmer Otto McCormack (probably better known as Jack McCormack). Defendant's place of business was a quonset hut type of building approximately 60 feet long north and south and 30 feet wide located

on the east side of and facing Lucas and Hunt Road in St. Louis County. The building had no windows. The electric service had been suspended, and the only source of light was through a glass pane in the front door located on the west side and immediately south of the center of the building and a smaller glass panel on each side of this door. Defendant was engaged in the junk business, buying and selling scrap metal and auto parts under the name of Harlan Salvage Company.

From the beginning the defendant has claimed that he thought he was shooting at a robber, that he did not know it was McCormack at whom he was shooting, and that had he seen it was McCormack he would not have shot. The state, on the other hand, contended that defendant not only knew it was McCormack at whom he was shooting, but had planned the crime at the place and time and in the very manner in which it occurred.

Police Corporal Roger Spreck testified that as a result of a call from the department dispatcher he went to Harlan Salvage Company arriving there shortly after 11 a. m. On arrival he found defendant standing at the street curb with a revolver in his hand. Defendant told him he had shot a holdup man inside the building. The officer took the revolver and went inside the building where he found the deceased lying supine on the floor. He recognized deceased as Elmer Otto McCormack, whom he knew as Jack, and then went outside and asked defendant if he knew whom he had shot. Defendant replied, "No, I don't." Informing him it was Jack McCormack the officer and defendant went inside the building where, at the officer's request, the shooting was reenacted and discussed.

In a statement given to Corporal Spreck and the coroner, received in evidence without objection, defendant said, in substance, that on the morning in question he arrived at his place of business shortly after 7 a. m., and about an hour later his employee, John Franks, arrived; that several cus-

tomers were in and out for a while and one wanted a door for a '50 Plymouth; that he told Franks to take a door off an old Plymouth, then he (defendant) went back inside the building to get some papers from a filing cabinet intending to take them outside where he could see; that while at the cabinet he heard a man's voice say, "Stick 'em up, this is a holdup." Frightened, he said, "Just a minute, I'll get the money." He then stepped sideways to a cabinet drawer from which he took his .38 caliber revolver and "wheeled right and started shooting" in the direction from which the voice came. (The voice had no doubt come from behind a counter about six feet east of the front door and ten or twelve feet north of where defendant had stood for it was here the body was found with three .38 caliber bullets in it, two having struck the chest and one the head.) He said he remembered little of what happened from the moment he started firing the revolver; that he saw a figure of a man and heard him, but did not know who it was; that he had seen no one enter the building; that he had last seen the deceased the evening of the day before at defendant's place of business and before that on the previous Thursday evening when deceased was at his home for a few minutes; that on the evening before he "had run him (McCormack) away" from his business; that deceased was at his home Thursday evening only a few minutes because "I just told him to go away." In this statement defendant further said he had known deceased as an "acquaintance" for three or four years; that his reaction at the time he heard this voice was: "The only thing I can figure that a guy is going to hold me up and is he ever going to believe that I only, that I got only $12.25 in my pocket or drawer."

Officer Jon Becker of the St. Louis County Police Department related three conversations he had with defendant on as many dates before October 29. The first conversation related occurred the morning of October 21 (Sunday) at defendant's place of business. The result of that conversation was that defendant gave the officer a Missouri automobile license number suggesting that it would be worthwhile to watch for that automobile. The second conversation occurred later that week on a parking lot on St. Charles Rock Road, defendant having asked the officer to meet him there. The substance of that conversation was: defendant told the officer that McCormack, referring to the latter as "the crazy man", had been to his home the evening before and he had "run him off"; that McCormack and others had used an automobile belonging to defendant in a burglary or robbery the evening before and he (defendant) was worried because the title was still in his name. The officer asked defendant whether he had information on other burglaries and robberies but received no reply. The third conversation was on the evening before defendant shot McCormack and took place on another parking lot, again at the suggestion of defendant. The substance of this conversation was that defendant told the officer that he had intended to shoot a holdup man (meaning McCormack whom he again referred to as "the crazy man") that night but did not because McCormack had not been at his (defendant's) place of business; that McCormack would come to his place of business within the next 36 or 48 hours (to get certain tanks McCormack had left there) and when he did defendant would be waiting for him and shoot him as a robber; that he would call the officer when this happened. In fact he did call him the next morning and told him he had "just shot a holdup man." The officer reported this telephone call to his superior, Lieutenant Austin Duke, and left immediately for Harlan Salvage Company.

Cross-examination of Officer Becker developed that his deposition had been taken twice in this case. The cross-examination was intensive, thorough and detailed in an attempt to show that the officer's testimony was bizarre, unbelievable and perjurious. In an effort to impeach him full use of the

depositions was made to confront him with his conflicting testimony as to dates of the three meetings he had with defendant, what was said at each, and whether he had or had not made a record of these meetings and reported them to his superiors. On redirect examination Becker explained that he had done nothing to prevent defendant from killing McCormack for "I didn't really myself believe that he would kill him"; that he "didn't believe Mr. Wallach had the intestinal fortitude to shoot and kill someone."

Defendant testified that he had known Jack McCormack very well, well enough that under ordinary circumstances he would immediately recognize him; that McCormack was a "very close friend." He said that before October 29 he had been sick, having had heart trouble and when this voice behind him said "stick 'em up" he was scared; that he "didn't see anything; that's what I was scared of"; that "[no one] would believe if a man is going to stick me up that I would have [only] $12.00 in my pocket"; that he was afraid for his own safety and "I wanted to protect myself." Except for the meeting on Sunday, October 21, defendant denied having met with Officer Becker at any time before the date McCormack was killed. As to that meeting he recalled only that they talked in generalities and remembered nothing of the particulars of that conversation. He denied categorically that he then, or at any other time before the shooting, discussed McCormack or anything about him with Officer Becker, and denied specifically each item of the officer's testimony pertaining to those three alleged meetings. He did not remember whether he had called Officer Becker immediately after the shooting.

There was evidence of a meeting after October 29 between the officer and defendant at which the officer by use of a hidden tape recorder was attempting to get evidence from defendant, but was unsuccessful. Full use of the circumstances of this meeting, and other alleged meetings

and conversations between these men after the shooting, was used on cross-examination of Becker in an attempt to degrade and destroy the value and force of the testimony of this key witness for the state. Like use was made by defendant of the fact that the officer had not made a record memoranda of each of these three meetings, and had not reported the content of these conversations to his superiors until after the shooting.

Three witnesses for the defense, including the widow of the deceased, testified that deceased was quite a practical joker; that he was continually simulating a robber to the discomfort of his friends. Apparently the purpose of this was to imply that defendant knew of this facet of deceased's nature. Deceased's widow testified also that defendant and her husband were friends; that no bad feelings existed between them; that she knew of no trouble between them in the last six months; and, that she knew of no reason why defendant would want to kill her husband.

■ In point "A" of respondent's "Points Relied On" the state suggests that this court, in its discretion, should dismiss this appeal for the reason the transcript was not timely filed, the transcript being filed more than five months after the notice of appeal without an extension of time. Rule 28.08; § 512.130. Respondent's suggestion is denied.

■ In his first point defendant contends that he should be acquitted because the verdict of guilty of manslaughter is not supported by evidence; that he was convicted of a crime of which he is innocent as a matter of law; and, therefore, his conviction is in violation of the due process clause of the Constitution of Missouri and the due process clause of the Fourteenth Amendment to the Constitution of the United States. He says that he was either guilty of murder under the state's evidence or he was innocent under his own. Essentially what defendant urges in this point is

that there were no facts in evidence sufficient to reduce the degree of the homicide from murder in the first degree to manslaughter and, hence, no evidence whatever on which to base his conviction of manslaughter. We note that the court gave an instruction on manslaughter, but he does not assign this as error.

Defendant admits that he shot and killed McCormack. The evidence in this case would support a conviction of murder in the first degree, a higher degree of homicide than that of which he was convicted. "Because the evidence shows * * * him to be guilty of a higher degree of the offense than that of which he [was] convicted," we may not stay or otherwise affect the judgment of conviction. Section 545.030, subd. 1(17). In addition to this section of our statutes we have another specifically applying to homicide which provides, in substance, that any person found guilty by a jury of any degree of manslaughter shall be punished pursuant to that verdict, although the evidence shows him to be guilty of a higher degree of homicide. Section 556.220. Defendant tacitly agrees that the Missouri rule is clear that when the evidence is sufficient to support a conviction of first degree murder a defendant is not entitled to complain that a submissible case was not made as to a lesser degree of homicide. State v. Morrow, Mo., 188 S.W. 75; State v. Davis, 321 Mo. 598, 12 S.W.2d 426; State v. Garrett, Mo., 282 S.W.2d 441; State v. Chamineak, Mo., 343 S.W.2d 153. However, he asks that these cases based on the above-mentioned statutes be reexamined in the light of his contention that those precedents and the statutes have denied him his constitutional guaranty of due process of law.

He suggests that §§ 556.220 and 545.030 must necessarily fall as they deny defendant due process. He is not denied due process by those sections. The crime of which he was convicted was included within the crime with which he was charged. State v. Ancell, 333 Mo. 26, 62 S.W.2d 443, 446 [5, 6]. In Thompson v. City of Louisville et al., 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 and Garner et al., v. State of Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207, cited by defendant, the Supreme Court of the United States held that convictions for loitering and disorderly conduct in Thompson and for disturbing the peace by peaceable "sit-ins" in Garner were so totally devoid of evidentiary support as to violate the due process clause of the Fourteenth Amendment. Neither of those cases involves convictions for lesser included offenses where there was evidence supporting a higher offense, and are to be distinguished from the instant case for that reason if for no other. Merely because our statute (§ 556.220) provides that he shall be punished according to the verdict although the evidence may show him to be guilty of a higher degree of homicide does not deprive him of due process; on the contrary, he is afforded due process by the statute in that it sanctions punishment assessed by the jury commensurate with a lower degree of homicide (included within the charge against him) more lenient and merciful than that assessable for a higher degree. He may not be heard to complain that he has been denied due process for he is relieved and benefited by the statute. It has been said that a statute which otherwise meets the requirements of due process does not deny due process of law by authorizing a jury under an indictment for a graver offense to punish for a lesser offense. 16A C.J.S. Constitutional Law § 580, pages 625–630. Davis v. State, 20 Tex.App. 302.

■ Defendant next contends that the court erred in refusing to permit him to read to the jury as a part of the defendant's case portions of the depositions of Officer Becker inconsistent with his trial testimony. In his offer of proof he does not state specifically which portions are being offered so we are left to assume, and do assume, for the purposes of this opinion, that he was offering all those portions about which he had cross-examined this witness. During the cross-examination, defendant, for

his announced purpose of impeachment, apparently confronted this witness with all the inconsistent testimony he deemed pertinent and helpful to his case. In not one single material instance do we find where Becker failed to acknowledge or admit that he had made the particular inconsistent statement or statements in his depositions. These admissions were direct, unqualified and without equivocation. The witness having admitted the prior inconsistent statements, subsequent proof of them as a part of defendant's case was not only unnecessary, they were inadmissible and the court did not err in excluding them. State v. Cooper, 83 Mo. 698, 701; Andrews v. Parker, Mo.App., 259 S.W. 807, 810 [9]. Also see: State v. Jones, Mo., 227 S.W.2d 713, 717 [11].

In the third point of his brief defendant asserts that "the court erred in prohibiting appellant from commenting upon or drawing an unfavorable inference from the failure of the state to produce Lieutenant Duke as a witness; and the court compounded the error by telling the jury that the witness was equally available to the defendant." Becker had testified that although he made no memoranda or other official record or report of his three earlier conversations with defendant prior to the shooting he did, immediately after the shooting, report to Lieutenant Duke the telephone call received from defendant that morning and also that two or three days later he told Duke of the three earlier conversations.

■ During his argument defense counsel, partly in reply to argument of counsel for the state, sought to comment upon the failure of the state to produce Lieutenant Duke as its witness. An objection to this comment was sustained. Proceeding to characterize Becker's testimony as incredible and unworthy of belief, counsel sought to draw an unfavorable inference from the failure of the state to produce Duke to corroborate Becker's testimony that he had told Duke of his con-

versations with defendant. In sustaining the state's objection to this argument the court remarked that Duke was equally available to defendant by subpoena. Later in his argument, without objection, counsel did draw an unfavorable inference from this lack of corroboration of Becker without using Duke's name, but nevertheless referring indirectly to Duke. Defendant contends that justice and fair play make it mandatory that the state call Duke as a witness to corroborate Becker. Of course, had the state called Duke as its witness, on proper objection by defendant, he would not have been permitted to testify what Becker had told him. Lieutenant Duke could possibly have testified that Becker had reported the mere fact that the conversations had occurred, but the state was not required to produce him as a witness for this purpose. The rule is that an unfavorable inference may be drawn by defendant from failure of the state to call as its witness one who was available and who might reasonably be expected to give testimony in its favor. State v. Beasley, 353 Mo. 392, 182 S.W.2d 541, 544; State v. Collins, 350 Mo. 291, 165 S.W.2d 647. However, this rule has the limitation that unfavorable inferences may not be drawn from the failure to produce a witness whose testimony would be merely corroborative of, or cumulative to, testimony of another witness, or whose testimony would not have been admissible. Roehl v. Ralph, Mo.App., 84 S.W.2d 405, 413 [10]; State v. McMillian, Mo., 338 S.W.2d 838, 843 [6]; 23A C.J.S. Criminal Law § 1099, p. 179; 22A C.J.S. Criminal Law § 594, pp. 373–374. While in the broadest sense of the term Duke was not "equally available" to defendant, as was remarked by the trial court, we do not consider that such remark, if error, was prejudicial to the defendant.

We consider defendant's points 4 and 7 together, point 4 being that the court erred in failing to instruct the jury that defendant had the right to prevent his place of business from being robbed and the right to shoot and kill, if necessary, to prevent

the commission of such felony upon his premises, and point 7 being that the court erred in giving instruction No. 3 in that it limited justifiable homicide to the killing of another in lawful defense of his person or in resisting an attempt to commit a felony upon him. Essentially, the two points are one; that is, that the court should have broadened his right of defense to include the right to defend his place of business.

Had the evidence supported defendant's theory that McCormack was killed in the defense of defendant's place of business it would have been the duty of the court to instruct on that defense whether requested or not. Rule 26.02(6); State v. Shiles, Mo., 188 S.W.2d 7. But we do not find evidence supporting defendant's theory. And defendant does not point to any evidence which would require the court to give such an instruction. At the time McCormack allegedly said "Stick 'em up" he was already inside defendant's place of business. Attacked inside his place of business defendant may justify or excuse the killing of his assailant if that is apparently necessary to save his own life or to protect himself from great bodily harm. Under those circumstances, however, the applicable law involved is that of self-defense, not the law of defense of his place of business. Vol. 1, Wharton, Criminal Law and Procedure, § 222. State v. Brookshire, Mo., 353 S.W.2d 681, 691. State v. Dollarhide, 337 Mo. 962, 87 S.W.2d 156, 159. Points 4 and 7 are ruled against defendant.

The fifth point in defendant's brief asserts: "The court erred in failing to give and read to the jury proper instructions embodying appellant's claim that he did not know at the time of the shooting that he was firing his gun at Elmer Otto McCormack particularly since he requested such instruction and offered to the court Instruction No. A submitting that defense." This may properly be considered in connection with his sixth point that: "The court erred in giving * * * Instruction

No. 3 for the reason that said instruction failed to require a finding that appellant knew it was Elmer Otto McCormack at the time he shot him; and assumed that to be true; and disparaged the entire theory of the defense."

Defendant appears to complain that instructions 1 and 2 (on first and second degree murder) are guilty of the same omission as that complained of in instruction No. 3. As he was convicted of manslaughter, he may not complain of alleged prejudicial error in instructions submitting a higher degree of the offense for which he was tried. It would serve no useful purpose to set out in full his refused instruction or those given; it will suffice to say that instruction No. 3 was the usual manslaughter instruction in approved form. We need consider only his assignments as to his refused instruction and the giving of instruction No. 3. State v. Foster, 355 Mo. 577, 197 S.W.2d 313, 319 [12]; State v. Brookshire, supra, 353 S.W.2d l. c. 689 [21, 22].

Instruction A refused by the court tells the jury they must acquit defendant unless they find beyond a reasonable doubt that he knew at the time it was McCormack at whom he was shooting and recognized him. This instruction is incorrect in that it limits the homicidal intent to specific intent to kill a specific person, McCormack, the actual victim. Defendant says he intended to shoot and kill another person, a robber.

The rule applicable here is stated in State v. Batson, 339 Mo. 298, 96 S.W.2d 384, 389 [6], to be " * * * that the act with respect to which the felonious intent will be 'transferred' from the object of the accused's design to the victim, is the homicidal act directed at the former and resulting in the death of the latter * * *." The rule is aptly uttered in other words in State v. Richardson, Mo., 321 S.W.2d 423, 428 [8–10] where it is said, "The constitutive elements essential to convict an accused of murder follow his bullet and are

transferred to his actual victim when they exist with respect to his intended victim", citing State v. Batson, supra, and 40 C.J.S. Homicide, § 18, p. 864; 26 Am.Jur., § 35, p. 179.

Even if defendant did not know or recognize his assailant to be McCormack, this is no defense in and of itself and the court did not err in failing to instruct thereon. For the same reasons, the court did not err in omitting from instruction No. 3 defendant's theory that the jury should have been required to find that he knew it was McCormack at the time he shot. Nor does instruction No. 3 assume, as contended by defendant, that he knew his assailant was McCormack.

Examination of those portions of the record required by Rule 28.02 discloses no reversible error.

The judgment is affirmed.

All concur.