STATE of Missouri, Respondent,

v.

Willie Curtis BLEVINS, Appellant.

No. 39631.

Missouri Court of Appeals,
Eastern District,
Division One.

April 24, 1979.

Rader, Richey & Price, Cape Girardeau, for appellant.

John D. Ashcroft, Atty. Gen., Paul R. Otto, Steven Clark, Asst. Attys. Gen., Jefferson City, Bradshaw Smith, Pros. Atty., Cape Girardeau, for respondent.

SMITH, Judge.

Defendant appeals from his conviction by a jury of rape, robbery, and kidnapping and the 99 year, 20 year, and 20 year sentences imposed by the court in accord with the jury verdict.[1] The court ordered the sentences to run concurrently.

The prosecuting witness was at the time of the offenses twenty years old, white, married and four and one-half months pregnant. She was employed as a ticket agent on the evening shift at the Cape Girardeau bus depot. Around 6:00 p. m. on March 8, 1977, defendant, a young black man, approached the counter and asked about a bus to Farmington. C.H., the victim, advised him the next bus was at 6:35 p. m. Defendant left the station and returned around 8:00 p. m. to purchase a ticket to Farmington. The next bus was an express bus and the driver refused to stop at Farmington. Upon being told by defendant that he could not ride the bus and that he had no money to stay anywhere, C.H. suggested that he could stay at the police station. On the previous evening the name of Willie Curtis Blevins was shown on the log of the Cape Girardeau Police Department. This log was a list of those persons given a ticket to stay at the Salvation Army. Sometime during the evening' defendant showed C.H. a round trip bus ticket to Washington, D.C.

At approximately 10:15 p. m. C.H. was closing the station. This involved placing the money in the safe, turning out the lights and locking up. She offered to drive defendant to the police station a short distance away. Once in the car defendant asked to be driven across the river to Illinois to a friend's house. C.H. refused but did agree to drive defendant to the house of a girl defendant claimed to know in Cape Girardeau. When they reached the house designated by defendant, C.H. stopped or parked the car and defendant started to leave. Then he reached over and tried to kiss C.H., but she refused. He then held a knife to her stomach and then to her neck, and ordered her into the back seat. At his instruction she partially disrobed and defendant had sexual intercourse with her. Defendant also stated he had a gun and that he would kill or stab her if she did not cooperate. C.H. testified she did not resist because of fear she would be killed or her baby injured.

Defendant had inquired before they left the front seat how much money was in the bus safe and whether C.H. had the combination. While in the back seat during the intercourse C.H. told defendant that if he wanted the money he should hurry because a bus would arrive at 11:15. Shortly there-

---

1. The jury actually assessed punishment on the rape charge at 99 years and 1 day. The court sentenced defendant to 99 years.

after defendant completed the act of intercourse, permitted C.H. to dress and ordered her to drive to the bus depot. C.H. put on her jeans but left her underpants on the back floor of the automobile.

They returned to the bus depot, left the car, and defendant grabbed C.H.'s arm tightly and they went inside. C.H. did not see the knife while in the bus station but believed it to be in defendant's pocket. She also thought he might have a gun, had felt something in his pocket but couldn't tell if it was a gun and "wasn't goin' to go ahead and see." C.H. opened the safe and defendant removed therefrom $941. He put the bills in various pockets and $80 in rolled change in C.H.'s purse.

Upon leaving the station defendant drove the car. They went out on the interstate toward St. Louis. The knife was open between defendant's legs as he was driving. The car ran out of gas on the exit ramp at the intersection of I–55 and Highway 32 near Ste. Genevieve. Defendant went to a filling station nearby which was closed. C.H. left the car and ran to a van nearby and tried to enter on the passenger side. The van pulled away and C.H. ran after it. Defendant caught up with her and slapped her and threatened to kill her. The slapping caused her nose to bleed. They returned to the car where C.H. used some tissue to stop the nose bleed and defendant tore off a part of her blouse to wipe fingerprints off the steering wheel and other parts of the car. Both the cloth and tissue were left in the car. They then began walking across a field into a wooded area. When they reached a dry creek bed defendant again ordered C.H. to disrobe and again had intercourse with her. He then threatened to kill her, but at her suggestion cut strings from her blouse and tied her to a tree. He then cut her bra and stuck a part of it into her mouth as a gag. Defendant then took hold of C.H.'s nipple and threatened to cut that off. C.H. screamed and defendant stated she could still be heard and tightened the gag. Defendant then left C.H. and returned to the area where she had dropped her purse. She then saw him run away and heard a noise which she thought was defendant throwing away her purse. C.H. freed herself, returned to the gas station and called the police. An officer was in the area investigating a report that a man had been seen striking a woman and he took C.H. to the Ste. Genevieve sheriff's office. He described C.H. as roughed up, disarrayed and mussed up.

C.H. talked to the Cape Girardeau police and her voice was shaky and crying. The description given caused those police to issue an arrest warrant for Willie Curtis Blevins, the man who the night before had signed the police log. Medical examination of C.H. six hours after her escape did not reveal any cuts, scratches, bruises or abrasions. The doctor could give no opinion, based upon his examination, of whether C.H. had suffered a bloody nose or had been raped. Seminal fluid stains were found on the tissues found in the car and on C.H.'s jeans. Spermatozoa was found on a slide taken from her vaginal area. The doctor testified such sperm could have still been present from intercourse occurring between C.H. and her husband forty-eight hours earlier. Blood on the tissue in the car was of the same type as C.H.'s blood. The Cape Girardeau special rape specialist discovered a slight scratch on C.H.'s breast after the physical examination which C.H. testified was caused by defendant's knife. This scratch was photographed. C.H.'s purse, an Afro comb, and a piece of C.H.'s garments were found in the vicinity where she was tied to the tree. Coin rolls were in the purse. Her underpants and a piece of her blouse were found in the car. Microscopic examination of C.H.'s clothing revealed that it had been cut and torn.

Defendant was arrested in Jefferson County on March 9. The arrest occurred after a chase when defendant attempted to flee. Defendant had a bus ticket dated March 8 from Cape Girardeau to Farmington and a round trip ticket to Washington, D.C. on his person when arrested. He also had $555.28 in various pockets. He had also paid $168 on the day of his arrest for car repairs. Following his arrest defendant made several inculpatory statements. The

circumstances of taking those statements will be discussed more fully later. The statements admitted that defendant rode in C.H.'s car with her, that they went to the bus station and that C.H. opened the safe, that she was scared at the time because she was like people who "don't know what's going to happen to them," that he didn't have a weapon, that he took the money and then they drove to Ste. Genevieve where he then tied C.H. to a tree and left her. Defendant took a polygraph examination and pursuant to stipulation the results of that examination were admitted into evidence. The polygraph examiner expressed his opinion that defendant lied when he denied (1) raping C.H., (2) knowing who raped C.H., (3) threatening to cut C.H. and (4) putting a knife to C.H.'s throat.

█ Defendant raises eight points on appeal. Seven of those can be disposed of in rather summary fashion. In view of the evidence outlined heretofore, the contention that the evidence was not sufficient to make a submissible case is patently without merit. While there were some inconsistencies in C.H.'s testimony, and while some of her actions could be regarded as unwise, the evidence overwhelmingly supports the verdict reached. The victim's testimony was corroborated in virtually every particular by physical or medical evidence and by defendant's statements. *See State v. Bohannon*, 526 S.W.2d 861 (Mo.App.1975). It stretches credulity beyond retrieval to conclude, as defendant suggests, that her testimony and the physical evidence were simply her explanation for a voluntary affair with defendant and a joint escapade to steal money.

█ Equally lacking in merit is defendant's contention that the trial court erred in instructing on robbery by means of a dangerous and deadly weapon because C.H. saw neither knife nor gun during the robbery. Initially it should be noted that the use of a weapon does not change the nature of the crime charged. The use of a weapon is simply a means of placing the victim in immediate fear of injury, the gravamen of first degree robbery. Sec. 560.120 RSMo

1969. An instruction on a weapon places an additional burden upon the State of which the defendant may not complain. *State v. Long*, 539 S.W.2d 592 (Mo.App.1976) [4–6]. Additionally the evidence is sufficient to establish that defendant had a knife before and after the robbery and that C.H. believed he had it with him during the robbery. Given what had occurred immediately prior to the robbery and the reasonable beliefs of C.H. that defendant would kill or injure her with the knife if she did not open the safe, we do not find the instruction to be unsupported by evidence. This also answers defendant's related contention that the court should have instructed on an unidentified lesser included offense "because there was no evidence that a weapon was used in the commission of the robbery." Robbery with a dangerous weapon is the same offense as first degree robbery. On appeal defendant has made no other claim of error in failing to instruct on a lesser included offense. In his motion for new trial defendant indicated that the evidence supported an instruction on second degree robbery. Sec. 560.125, RSMo 1969. Such contention is not advanced on appeal and has been abandoned. If it had been preserved it would not have merit. All of the evidence established that C.H. feared immediate injury throughout the time she was with defendant. She did not open the safe because of fear of injury at some other time; if she did so in fear it was fear of immediate injury. There was no evidence of second degree robbery.

█ Defendant's attack upon the sentences as excessive is also without merit. The sentences were within the statutory range and were therefore not excessive. *State v. Stephens*, 507 S.W.2d 18 (Mo. banc 1974) [8].

█ Defendant makes two contentions concerning the jury panel. Neither is established by the record. Systematic exclusion of blacks is not established simply because there were no blacks on the jury. *State v. Robinson*, 484 S.W.2d 186 (Mo.1972) [1–5]. Prejudice of the jury panel because of extensive media coverage is not estab-

lished because there has been such coverage or because many of the venire panel have read about the case. The matter was raised on voir dire and the record gives no indication that the panel was prejudiced by the publicity or that the jurors selected could not fairly judge the case because of such publicity. *State v. Cooper*, 541 S.W.2d 40 (Mo.App.1976) [5].

Defendant also premises error upon the admission into evidence of a vial of blood. There was no evidentiary base of the source of the blood, what if any connection it had to the victim, defendant or investigation of the crime, or what its relevance or materiality to the case was. The admission of it into evidence was error. We find no prejudice however. No reference was made to the vial during the case and as indicated it was not tied to defendant, victim or crime. We do not believe that a vial of blood is so prejudicial per se, that its mere appearance constitutes reversible error. Unlike a weapon or some inherently inflammatory exhibit the presence of an unmentioned and unidentified sample of blood does not, without more, warrant a finding of prejudice requiring reversal.

We turn now to the most serious contention raised by defendant—the admission of his inculpatory statements to two police officers. Some additional facts are necessary. Following his arrest, defendant was conveyed from Crystal City to Hillsboro by State Patrolman Spring. He was given *Miranda*[2] warnings by Spring and stated he did not wish to make any statement without an attorney present. Spring did no questioning after defendant invoked his right to counsel. Defendant was then placed in the Jefferson County Jail in Hillsboro where he remained for several hours. Two detectives from the Cape Girardeau police department, Lincecum and Brown, took defendant from the jail and placed him into a police car for transportation to Cape Girardeau. Spring testified that he advised Brown and Lincecum that defendant had requested an attorney. Neither Brown nor Lincecum remembered that Spring had so advised them, although neither denied that Spring did so. Lincecum did testify that Spring advised him that defendant had received *Miranda* warnings and that Spring had not questioned him. We will presume as the State has, that Lincecum and Brown were advised of defendant's invocation of the right to counsel.

After placing defendant in the car, Lincecum again advised defendant of his *Miranda* rights. Defendant was wearing travel restraints at the time. After each of the rights Lincecum elicited a positive response of understanding from defendant. After being advised of his right to counsel, Blevins stated that his mother was getting an attorney for him but that he would "gladly" tell the detectives the same thing he was going to tell his attorney. He further indicated that he would talk about the incident but would not discuss the rape charges. During the subsequent questioning he adhered to this position—answering questions about the incident but refusing to discuss the rape charges. Both Lincecum and Brown testified that no coercion, trickery, threats or promises were used to induce the statements; that Blevins was sober, of average intelligence, had completed the 11th grade, could read and write, and was very cooperative and very courteous. Defendant presented no evidence contrary to the testimony of the police officers. Credibility of the officers' testimony was for the trial court, which impliedly, at least, found it credible.

Defendant's challenge to the statements under the *Miranda* case, *supra*, presents two questions which must be resolved. First, where a defendant, following *Miranda* warnings, invokes his right to counsel, may he thereafter waive that right and secondly, if he may waive did Blevins do so here.

The first question requires a determination of whether *Miranda*, as subsequently defined in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) and *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct.

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

1232, 51 L.Ed.2d 424 (1977), imposes a *per se* rule precluding any further inquiries by police officers without counsel after the suspect has expressed his desire for counsel. The language of *Miranda* would indicate that it imposes a *per se* rule.[3] But the same can be said for the invocation of the right to remain silent.[4] In *Michigan v. Mosley, supra,* the court held that the seemingly absolute language of *Miranda* on the right to remain silent did not in fact create a *per se* rule and that the admission of such statements into evidence was dependent upon whether the right of the person to cut off questioning was "scrupulously honored." The Court held admissible statements taken several hours after the initial invocation of the right of silence, by a different police officer in a different location concerning a different crime and following new *Miranda* warnings. In a footnote the Court specifically stated that the *Mosley* case did not "involve the procedures to be followed if the person in custody asks to consult with a lawyer . . ." 423 U.S. l.c. 101, 96 S.Ct. l.c. 325. In a concurring opinion Mr. Justice White indicates that while under *Miranda* the invocation of the right to remain silent does not create a *per se* rule, the invocation of the right to counsel does. 423 U.S. l.c. 109–10, 96 S.Ct. 321 including Footnote 2. The rationale for this distinction is indicated in the footnote to be based upon the suspect's willingness to rely upon his own decision making powers in electing to remain silent, as contrasted to his doubt of his competency to make such decision reflected in his indication of need of counsel. Whether in fact the average suspect chooses the right he intends to invoke upon such a refinement in thinking is problematical. And while any waiver must be regarded with "skepticism",[5] we entertain some doubts that such skepticism is in one case rebuttable and in the other irrebuttable.

Subsequent to *Mosley,* the Supreme Court held in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) that statements made and actions taken by the defendant were inadmissible at trial because of a denial of right to counsel where the statements and actions occurred as a result of police interrogation occurring after a promise by the police to defendant's counsel that no interrogation would take place. Although frequently cited as a *Miranda* based decision, *Brewer v. Williams* is in fact the progeny of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), because judicial proceedings had been initiated against Williams before the statements were made. He was, therefore, not simply a suspect entitled to *Miranda* protections, but a criminal defendant entitled to the more extensive protections of *Massiah.* Despite this the Supreme Court specifically stated that it was not holding that Williams *could not* waive his rights to counsel, but only that he had not.[6]

---

3. "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. l.c. 444–5, 86 S.Ct. l.c. 1612.

"If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. l.c. 474, 86 S.Ct. l.c. 1628.

4. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation *must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement* taken *after* the person invokes his privilege *cannot be other* than the product of compulsion, subtle or otherwise." (Emphasis supplied) 384 U.S. l.c. 473–4, 86 S.Ct. l.c. 1628.

5. *See* 423 U.S. l.c. 110 Footnote 2, 96 S.Ct. 321.

6. "Despite Williams' express and implicit assertions of his right to counsel, Detective Leaming proceeded to elicit incriminating statements from Williams. Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no effort at all to ascertain whether Williams wished to relinquish that right. The circumstances of record in this case thus provide no reasonable basis for finding that Williams waived his right to assistance of counsel.

"The court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." 430 U.S. l.c. 405–6, 97 S.Ct. l.c. 1243.

In *United States v. Rodriguez-Gastelum*, 569 F.2d 482 (9 Cir. 1978) the Ninth Circuit Court of Appeals en banc struggled with the same question presented here. By a 6–3–2 division the court concluded that in view of *Mosley, supra*, and *Brewer, supra*, the language of the *Miranda* decision concerning invocation of the right to counsel did not constitute a *per se* rule precluding a subsequent waiver. The three concurring judges agreed with the majority that no *per se* rule was created, but disagreed upon whether waiver had been established. We see little point in further extending this opinion by reiterating the arguments set forth at length in *Rodriguez-Gastelum*. Suffice it to say that for the reasons set forth in the majority opinion in that case and based upon our own analysis of *Miranda, Mosley*, and *Brewer*, and what we conceive to be the Constitutional protections afforded by those opinions, we do not believe a *per se* rule has been created which would absolutely preclude the admissibility into evidence of defendant's statements. *See also State v. Olds*, 569 S.W.2d 745 (Mo. banc 1978) [5, 6]; *State v. Dominick*, 354 So.2d 1316 (La.Sup.1978) [1, 2].

■ We turn to the question of waiver. The test is that set forth in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938):

> "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." l.c. 464, 58 S.Ct. l.c. 1023.

■ There is nothing in the record to indicate that any coercion, trickery, harassment, deceit, threats or promises were utilized to obtain defendant's statements. Defendant was given his *Miranda* rights immediately following his arrest and following his invocation of a right to counsel no further questioning occurred for several hours. No questioning occurred by Brown and Lincecum until the *Miranda* rights were once again read to defendant and he had affirmatively responded that he understood each right. When the right to counsel was reached defendant affirmatively stated that his mother had hired a lawyer but that he would tell the police what he would tell his lawyer. He refused throughout to discuss the rape charge evidencing his understanding of his rights and his willingness to discuss part but not all of the charges against him. Defendant was sober, intelligent, reasonably well-educated, polite and cooperative. In his statement he indicated a sense of guilt and remorse because he had never stolen anything before. This also supports the conclusion that his statements were voluntarily and knowingly made. We find no impropriety in the police again giving him *Miranda* warnings before embarking upon an automobile journey of several hours. To have failed to do so would have created the possibility that purely volunteered statements of defendant would have been rendered inadmissible or alternatively that defendant could incriminate himself unintentionally through idle conversation because of his lack of awareness that such talk could be used against him. Nor do we believe the desires of the police officers to question defendant, frankly testified to by them, is of consequence in determining whether defendant waived his rights to counsel. Such desires may be considered by the fact finder in assessing the credibility of the officer's testimony of the circumstances leading to the defendant's statements and waiver of his rights. But such *desires* or intentions alone do not vitiate the admissions unless the police *conduct* which lead to the statements is proscribed. We find no evidence here that the statements were involuntary either in fact or law or that the waiver was other than intelligently, knowingly and voluntarily made. We reject, as did the majority, the position of the concurring judges in *Rodri-*

*guez-Gastelum, supra,* that the waiver must be initiated by the defendant, if by that is meant that the waiver must be volunteered out of the blue. Here the waiver occurred when defendant was advised of his right to counsel, but it was not suggested by the police officers nor dragged from him reluctantly. Defendant's right to cut off questioning was "scrupulously honored." We find defendant waived his constitutional rights to counsel prior to his inculpatory statements.

Judgment affirmed.

WEIER, C. J., and SNYDER, P. J., concur.