STATE of Missouri, Respondent,

v.

James Wilson CHAMBERS, Appellant.

No. 67191.

Supreme Court of Missouri, En Banc.

July 15, 1986.

Rehearing Denied Sept. 16, 1986.

all the implications of this holding, but it seems to represent the firm position of the Court.

Thomas R. Schlesinger, St. Louis, for appellant.

William L. Webster, Atty. Gen., Victorine P. Mahon, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant James Chambers was jury tried and sentenced to death for the capital murder of Jerry Lee Oestricker. We have exclusive appellate jurisdiction. Mo. Const. art. V, § 3. In this appeal, defendant assigns as error: (1) failure to instruct on self-defense; (2) denial of his motion for change of venue; (3) improper death qualification of the jury, and; (4) refusal to allow defendant to argue an adverse inference from the State's decision not to call a certain witness. We affirm.

The first point of error posited in this appeal—that the trial court erred in refusing to instruct on self-defense—was the very ground upon which this Court reversed defendant's first conviction and death sentence for the capital murder of Jerry Lee Oestricker. *See State v. Chambers*, 671 S.W.2d 781 (Mo. banc 1984). In *Chambers I*, we held that the evidence presented at defendant's trial in December of 1982 warranted a self-defense instruction.

Because defendant's tendered self-defense instruction in the present case—defendant's second trial—was refused and because the quantum and quality of evidence in this case differs from the evidence adduced at defendant's first trial for the capital murder of Jerry Lee Oestricker, we again must examine the sufficiency of the evidence in connection with the issue of self-defense—to determine whether the trial court in the present case committed reversible error in refusing to accept defendant's tendered instruction on self-defense. In conducting our review, we must consider the evidence in a light most favorable to defendant's construction of the facts. *State v. Fincher*, 655 S.W.2d 54 (Mo.App. 1983).

The chain of events which ultimately led to the slaying of Jerry Lee Oestricker began and ended at the Country Club Lounge in Arnold, Missouri. At approximately 7:00 p.m. on May 29, 1982, Oestricker, who was playing pool and drinking, bumped into the chair of another patron of the bar, Jackie Turner. Turner was seated at a table with members of his family. Immediately after Oestricker bumped into Turner's chair, the two men began to argue. Before this verbal confrontation progressed any further, Kenneth Vaughn, the owner of the bar asked the parties involved in the argument to leave the bar. The Turner family departed, but Oestricker remained at the bar and continued to play pool.

Defendant made his first appearance that evening at the Country Club Lounge at approximately 10:00 p.m. Upon entering the bar, he asked an employee, Norma Jean Ieppert, where he could find the Turners. When Mrs. Ieppert informed defendant that the Turners had left the bar earlier in the evening, defendant immediately departed. Defendant, however, returned approximately 30 minutes later in the company of Jackie Turner.

Once inside the bar, defendant immediately approached Oestricker and asked the victim to buy him a drink. Oestricker, referring to defendant by his nickname, "Bimbo", indicated in strong language that he had no desire to buy defendant a drink. During this initial confrontation between defendant and Oestricker, no blows were exchanged and one witness who was present at the time, Fred Ieppert, testified that this initial exchange of words was loud. And he testified further that defendant told the victim, "I thought you were a friend of mine." To this statement, Oestricker replied, "No, you are no friend of mine." This exchange of words was corroborated by the testimony of a number of other witnesses who were present that evening. After a few minutes had passed, the owner of the bar, Kenneth Vaughn, told the two men to leave the bar.

The evidence presented at trial leaves no room for doubt that defendant exited the bar before the victim. Defendant contends that Oestricker, whose blood alcohol level was determined to be .14 was "crazy drunk" and "trying to get a fight going with anybody he could." And there was evidence that before leaving the bar, Oestricker told defendant that "[defendant] didn't scare him" and "if you want a piece of my ass just come on."

A total of five witnesses, all of whom were present immediately before and after Oestricker was shot, testified that defendant, as he was leaving the bar, turned to Oestricker and yelled, "come on motherfucker we'll settle this outside." Each of these witnesses testified that defendant began the entire confrontation when he approached Oestricker and asked the victim to buy him a drink.

The State presented testimony from a number of witnesses that as defendant

walked out of the bar, he reached under his shirt and removed an object. One patron, thinking defendant had pulled a hidden knife yelled to Oestricker, ". . . he's got a knife." There was no testimony that the victim was armed with a weapon of any kind. Defendant, however, contends that there was evidence to suggest Oestricker was in possession of a pair of needlenose pliers which were found near the victim's body. However, the owner of the bar testified that the pliers belonged to him and fell out of his pocket when he removed a handkerchief to wipe his nose while standing over the victim.

Within seconds after Oestricker stepped outside the front door, a single shot was heard. Fred Ieppert, who testified that he witnessed the shooting, stated that as Oestricker walked through the door, he saw defendant hit Oestricker with a pistol, knocking him to the ground. As Oestricker got up with his hands raised in the air, defendant pointed the pistol at the victim and fired a single shot into the victim's chest. Not a single witness testified that Oestricker was the first to strike a blow, or even had the opportunity to do so.

Further, testimony was presented that after shooting Oestricker, who by that time was lying prostrate on the ground, defendant proceeded to pistol whip the victim about the face, drag him across the parking lot, and taunt him with the following statements: "take that you motherfucking tough guy" and "get up motherfucker and fight like a man". And defendant also told the mortally wounded victim, "You better get up and call the hospital because you are going to die." Seconds later defendant yelled to the patrons inside the bar, "if any of the rest of you motherfuckers want some of this, come on out." Thereafter, defendant ran from the scene and fled in a waiting automobile. He was apprehended later that evening by Arnold police at a liquor store in St. Louis County.

■ Under Missouri law, a person is entitled to use deadly force in defense of his person only when there is an absence of aggression or provocation on the part of the defender and only when there exists a real or apparently real necessity for the person defending himself to kill in order to avoid immediate danger of serious bodily injury or death. *State v. Chambers,* 671 S.W.2d 781. *See also State v. Wilson,* 645 S.W.2d 372 (Mo.1983); *State v. Ivicsics,* 604 S.W.2d 773 (Mo.App.1980). Furthermore, deadly force is justified only when there is a reasonable cause for the defender's belief in the need to use it and the defender has done all in his power consistent with his personal safety to avoid the danger and the need to take a life. *State v. Chambers,* 671 S.W.2d at 783.

In *Chambers I* there was evidence that the victim, Oestricker, perpetrated the initial act of physical aggression by striking defendant in the face. And in *Chambers I,* we pointed out that there was evidence that the victim was 6'4" and 250 pounds while defendant was only 5'6" and 150 pounds. In that case we held that because of the disparity in physical size and because the evidence showed the victim was the initial aggressor, there was sufficient evidence to support an instruction on self-defense and the reasonableness of defendant's course of conduct was a question that fell within the sound discretion of the jury. *State v. Chambers,* 671 S.W.2d at 783–84.

In the present case, however, there is absolutely no evidence in the record that the victim committed the initial act of physical aggression. There was simply no testimony that Oestricker, either inside or outside of the bar, committed the initial act of physical aggression. Furthermore, Dr. Leland Thomas, the certified pathologist who conducted the autopsy on the body of the victim testified that Oestricker was only 6'0" tall and weighed approximately 200 pounds. And there was additional evidence that defendant was somewhere between 5'6" and 5'8" tall and weighed as much as 160 pounds.

The evidence presented at trial was undisputed that the initial provocation occurred when defendant, upon entering the bar with Jackie Turner, who earlier in the evening had an argument with the victim,

approached the victim and requested that Oestricker buy him a drink. This request by defendant, who was already armed with a concealed pistol, elicited a profane refusal from the victim. After provoking the victim in this manner, defendant then challenged the victim to settle the matter outside. Defendant, however, was prepared to settle it with the use of a deadly weapon, which he readied for use before leaving the inside of the bar. The victim, who was unarmed, was first physically assaulted and then shot in the chest only seconds after he exited the bar.

There is simply no evidence in the record to support the conclusion that defendant was not the initial aggressor or that he did not provoke the entire series of deadly events from the time he entered the bar in the company of Jackie Turner. Furthermore, the evidence which defendant relies upon to support his theory of self-defense is woefully unconvincing that there existed either an apparent or real necessity for him to use deadly force to avoid serious bodily injury or death.

Additionally, defendant's construction of the facts in this case fails to notice an absence on his part to do all within his power consistent with his personal safety to avoid the danger and the need to take the victim's life.

Instead of immediately leaving the bar, he actively encouraged the victim to accompany him outside to settle the argument. And waiting outside the bar was the car in which defendant arrived. Rather than avoid any real or apparent danger that existed, defendant instead chose to confront the victim. Only after defendant knocked the victim to the ground, shot him in the chest, and beat the victim further did defendant flee in the waiting vehicle.

We have conducted a searching examination of the trial transcript and have considered the evidence in a light most favorable to defendant, and we are unable to conclude that there was sufficient evidence to support an instruction on self-defense or to allow the trier of fact to conclude that defendant's conduct was reasonable.

Thus, we find no error in the trial court's refusal to submit defendant's tendered instruction on self-defense.

■ Defendant next asserts that the trial court erred in refusing to sustain his motion for a change of venue. Specifically, defendant argues that the existence of pretrial publicity surrounding his case rendered it impossible for him to receive a fair trial in Jefferson County. Therefore, he contends that the trial court abused its discretion in denying defendant's motion for change of venue. In connection with the issue of pretrial publicity, the state and defendant stipulated to the existence, content and circulation of the various newspaper articles concerning defendant. Defendant filed two separate motions for change of venue and two separate hearings were held. The trial court reserved ruling on the motions until the time of trial—to allow further opportunity to determine the nature of the pretrial publicity and the existence of prejudice.

Whether a motion for change of venue should be granted or denied is a matter that properly lies within the sound discretion of the trial court. *State v. Boggs*, 634 S.W.2d 447, 457 (Mo. banc 1982); *see also State v. Molasky*, 655 S.W.2d 663, 666 (Mo. App.1983). And for an appellate court to find an abuse of discretion, the record must establish that the minds of the inhabitants of the county are so prejudiced against defendant that a fair trial cannot be conducted. *State v. Carr*, 687 S.W.2d 606, 612 (Mo.App.1985).

It is a settled principle of law that "exposure to publicity is not deemed inherently prejudicial and a juror may be sworn if he is able to set aside any opinion formed from the publicity when he enters the jury box." *State v. Molasky*, 655 S.W.2d 663, 667 (Mo.App.1983), *cert. denied, Molasky v. Missouri*, 464 U.S. 1049, 104 S.Ct. 727, 79 L.Ed.2d 187 (1984); *see also State v. Blevins*, 581 S.W.2d 449, 453–54 (Mo.App. 1979). Defendant does not point to specific venirepersons who were aware of and prejudiced by the pretrial publicity. Rather, defendant assumes that because there was

significant pretrial publicity, the inhabitants of Jefferson County were invariably and unalterably prejudiced against him to an extent which precluded the possibility of a fair trial. The transcript of the two hearings held on his motions for change of venue and the transcript of voir dire, however, do not support defendant's contention that it was an abuse of discretion for the trial court not to sustain defendant's motion for change of venue. All of the potential jurors were closely questioned on whether they had read or heard anything about the crime with which defendant was charged and about their ability to be fair and impartial. The trial judge's concern for the danger of a tainted jury is quite evident from the cautious manner in which he proceeded. In this connection, defendant's claim of prejudice and denial of due process is not supported by the record and we hold that the trial court did not abuse its discretion in denying defendant's request for a change of venue.

■ Defendant's next contention concerns the trial court's refusal to prohibit the death qualification of the jury. The trial court refused to sustain defendant's objections to the prosecution's removal for cause from the venire panel those potential jurors who expressed an inability to consider a sentence of death. In connection with this same point, defendant also assigns error to the trial court's refusal to sustain his objection to the removal for cause of a venireperson who defendant contends was improperly removed for religious reasons in violation of Mo. Const. art. I, § 5.[1]

This Court has consistently and steadfastly refused to find a constitutional violation in the practice of death qualifying a jury. *See State v. Driscoll*, 711 S.W.2d 512 (Mo.banc 1986); *State v. Roberts*, 709 S.W.2d 857 (Mo.banc 1986); *State v. Zeitvogel*, 707 S.W.2d 365 (Mo.banc 1986). *See also, Lockhart v. McCree*, — U.S. —, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Defendant's point is denied.

■ Defendant argues further that the removal for cause of venireperson Louis Gerleman, who stated that he would have trouble imposing a sentence of death because of his religion violated Mo. Const. art. I, § 5. The content of the transcript belies defendant's assertion that venireperson Gerleman was removed for religiously discriminatory purposes. Venireperson Gerleman was struck from the panel on the basis of his inability to follow the law and consider a sentence of death—and not because of his religious persuasion or beliefs. We find that the record is completely devoid of any evidence of religious discrimination that would offend Mo. Const. art. I, § 5.

■ Defendant's final point assigns error to the trial court's refusal to permit defendant during closing argument to draw an adverse inference from the State's decision not to call an Arnold Police detective involved in the initial crime scene investigation. That portion of defendant's closing argument to which the State objected and which the trial court ordered removed from the record proceeded as follows:

> We know from Kenneth Vaughn that he and Det. Hanna made a search for marks on Sunday. Det. Hanna is from the Detective Bureau. Presumably, he looked inside and outside and everywhere you might expect to find a mark.
>
> He is on their side. He is in their detective bureau. He did not call him as a witness.

Defendant is correct that "the general rule 'is that an unfavorable inference may be drawn by defendant from failure of the state to call as its witness one who was available and who might reasonably be expected to give testimony in its favor.'" *State v. Lansford*, 594 S.W.2d 617, 620 (Mo.banc 1980), quoting *State v. Wallach*, 389 S.W.2d 7, 13 (Mo.1965). First, the fact that the police never actually determined where the bullet that killed the victim ultimately embedded itself was already in evi-

---

1. Mo. Const. art. I, § 5 provides that "no person shall, on account of his religious persuasion or belief, be … disqualified from … serving as a juror."

dence by way of the testimony of Kenneth Vaughn and in the form of photographic exhibits. Second, defendant *conceded at trial* that this evidence had already been admitted by way of photographic exhibits and through the testimony of Kenneth Vaughn. Because Detective Hanna's testimony would have been corroborative or cumulative to other evidence already admitted, defendant was not entitled to draw an unfavorable inference from the State's decision not to call Detective Hanna. *State v. Lansford*, 594 S.W.2d at 622. We find no abuse of discretion in the trial court's refusal to allow defendant to make this argument.

■ In accord with § 565.014, RSMo 1978, (repealed effective October 1, 1984 and replaced by § 565.035, RSMo Cum. Supp.1984) we must now conduct an independent review of defendant's sentence of death. In so doing we must consider the following matters:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

■ There is a complete absence in the record of any evidence that the sentenced imposed was a product of passion, prejudice, or any other arbitrary factor. And there was substantial evidence to support the jury's finding of the mandatory statutory aggravating circumstances—that defendant committed the murder of Jerry Lee Oestricker in a wantonly vile and horrible manner on May 29, 1982 and that defendant had a substantial history of serious assaultive convictions. Section 565.012, RSMo 1978 (repealed effective October 1, 1984 and replaced by § 565.032, RSMo Cum.Supp.1984).

In connection with the jury's finding of this latter aggravating circumstance—that defendant had a substantial history of serious assaultive convictions—the State introduced uncontroverted evidence that in 1973 defendant was convicted of felonious assault and in 1975 he was convicted of assault with intent to kill with malice aforethought. Further, the State's evidence at the sentencing phase of the trial revealed that at the time defendant murdered Jerry Lee Oestricker, he was an inmate at the Missouri Department of Corrections, St. Mary's Honor Center in St. Louis and on that evening he was free to travel outside the Honor Center because he had been issued a 24-hour pass. Finally, we note that the State produced further evidence that defendant told a probation officer after the murder of Mr. Oestricker that defendant never did achieve his life goal of killing a police officer.

■ Finally, our mandatory independent review requires us to consider whether the sentence of death is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. We have examined cases involving similar circumstances and conclude that the penalty imposed in the present case is neither excessive or disproportionate to the penalty imposed in similar cases. *See e.g., State v. Smith*, 649 S.W.2d 417 (Mo.banc 1983), *cert. denied, Smith v. Missouri*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. LaRette*, 648 S.W.2d 96 (Mo.banc 1983), *cert. denied, LaRette v. Missouri*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. Newlon*, 627 S.W.2d 606 (Mo.banc 1982), *cert. denied, Newlon v. Missouri*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *State v. Mercer*, 618 S.W.2d 1 (Mo.banc 1981), *cert. denied, Mercer v. Missouri*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

The judgment is affirmed.

HIGGINS, C.J., RENDLEN, J. and BERREY, Special Judge, concur.

BLACKMAR, J., concurs in result in separate opinion filed.

DONNELLY, J., dissents.

WELLIVER, J., dissents in separate opinion filed.

ROBERTSON, J., not sitting.

BLACKMAR, Judge, concurring in result.

There is a mystery as to why the evidence that the victim struck the defendant, knocking him to the ground, which was held to require a self-defense instruction in the first trial, was not offered in the second. If the witness were unavailable, his sworn testimony could have been read into evidence.

It would have been better for all concerned if the trial judge had given the requested instruction on self-defense. There is a risk in refusing the request. The claim of self-defense would undoubtedly have been as unconvincing to the jury as it was to the judge. Yet I agree with the principal opinion, in concluding that there was no legal error in refusing the request.

I also agree that the sentence was not inappropriate, because of the "serious assaultive conditions." The record indicates that the defendant had a disposition toward deadly force over trivial matters, when he had the means at hand. The jury could have found that there was much more than a mere "barroom altercation," and that the armed defendant sought the victim out, deliberately provoking a confrontation in which he intended to use his weapon to kill. It is not necessary to decide whether the murder was committed "in a wantonly vile and horrible manner."

WELLIVER, Judge, dissenting.

I respectfully dissent.

This is an ordinary barroom altercation, where, following the first trial, we reversed for failure to give a self defense instruction. No self defense instruction was given in the second trial. Whether a self defense instruction should or should not have been given on this record, I am unable to see any new or additional evidence that changes the case from a barroom altercation.

Under these circumstances, I cannot impose the death penalty. I would reduce the sentence from death to life imprisonment without parole for fifty years; otherwise, proportionality in Missouri is reduced totally meaningless.

The principal opinion, I fear, becomes the best evidence for proof of a charge of ineffective counsel.