Maurice Oscar BYRD, Appellant,

v.

William ARMONTROUT, Warden of
Missouri State Penitentiary,
Appellee.

No. 88–1903.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 9, 1989.

Decided June 27, 1989.

Rehearing and Rehearing En Banc
Denied Sept. 6, 1989.

**4**

Burton H. Shostak, D.J. Kerns, Clayton, Mo., for appellant.

Stephen D. Hawke, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before McMILLIAN, ARNOLD, and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Maurice Oscar Byrd appeals the District Court's [1] denial of his petition for a writ of habeas corpus. We affirm.

In 1982, Byrd was convicted in a state trial court of four counts of capital murder. The murders were committed in connection with a robbery at Pope's Cafeteria in the West County Shopping Center in St. Louis County. On October 23, 1980, two employees of Pope's arrived for work around 7:35 a.m. to discover the bodies of James Wood, Carolyn Turner, and Edna Ince in the cafeteria business office. Each had been shot to death. A fourth victim, Judy Cazaco, had been shot through both eyes, but was still alive. Several thousand dollars were missing from the two safes in the business office. Cazaco died about ten days later.

Byrd was arrested in Savannah, Georgia some eight months later and charged with having murdered the Pope's Cafeteria employees. At trial, the state introduced evidence showing that Byrd had serviced Pope's Cafeteria in the course of his employment with a pest control service, that he had left the St. Louis area shortly after the robbery and killings took place, that he had shown up in Georgia soon thereafter with a substantial amount of cash, and that Byrd had stated to Sandra Sanders Byrd

that he had killed three people to be with her and their baby in Georgia. The state also introduced the testimony of two men Byrd had known in Georgia, one his former brother-in-law and the other a cell mate of Byrd in the Chatham County, Georgia jail, both of whom testified Byrd had confessed to them that he had killed people in a restaurant robbery. The jury found Byrd guilty as charged.

Following the sentencing phase of Byrd's bifurcated trial, the jury voted to impose the death penalty, and Byrd was sentenced to death on each of the four counts. His conviction and sentences were affirmed on direct appeal by the Missouri Supreme Court, sitting en banc. *See State v. Byrd,* 676 S.W.2d 494 (Mo.1984) (en banc), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985). Byrd then filed for state post-conviction relief under Missouri Supreme Court Rule 27.26. The trial court's denial of Byrd's 27.26 motion was affirmed by the Missouri Court of Appeals. *See Byrd v. State,* 723 S.W.2d 37 (Mo.Ct. App.1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 203, 98 L.Ed.2d 155 (1987).

Byrd then filed for federal habeas corpus relief in the District Court. Finding no need for an evidentiary hearing, the District Court, in a thorough and well-reasoned opinion, denied relief on each of the nineteen grounds that Byrd asserted. *See Byrd v. Armontrout,* 686 F.Supp. 743 (E.D.Mo.1988). This appeal followed.

I.

■ Byrd contends that his trial counsel was ineffective in several respects. Our task is to examine each claim to determine whether counsel's conduct was deficient, and if so, whether that conduct so prejudiced Byrd as to undermine confidence in the outcome of the trial. *See Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). Should we conclude that counsel's conduct was reasonable under the circum-

---

**1.** The Honorable John F. Nangle, Chief United States District Judge for the Eastern District of   Missouri.

stances, we need not reach the issue of prejudice.

■ Byrd first complains that counsel's decision to call Oscar Ford to the stand constituted ineffective assistance of counsel. Ford was a maintenance man at the West County Shopping Center, and had been sweeping near the entrance to Pope's Cafeteria on the morning of the murders. Immediately after the murders, Ford was taken by police to several different police stations and was held for nearly two days of questioning. During this period, Ford made photo identifications of three black men (none of them Byrd), claiming he had seen them exit the shopping center and go toward a yellow car. Apparently after discovering the identity of one of the men whose photograph he had picked out, Ford recanted his identifications. He was released and went into hiding. Several months later, after Byrd's picture had appeared in a St. Louis newspaper in connection with the Pope's investigation, Ford went to Georgia and picked Byrd out of a lineup. At trial, Ford testified that he had seen Byrd exit the shopping center on the morning of the murders. Byrd contends that counsel's decision to call the one man who would place him at the scene of the crime was unreasonable. We disagree.

The testimony given by Byrd's trial counsel at the 27.26 hearing establishes a reasonable basis for the decision to call Oscar Ford. Counsel was seeking to establish a connection between Ford's original statements to police about the three black men and the yellow car and the testimony of a young girl named Faraby Lombardo, who would later testify that she had seen three black men in a yellow car in her neighborhood near the shopping center around 8:10 that same morning. Such testimony would clearly be exculpatory, since the state's own case had included the testimony of a woman with whom Byrd worked that Byrd was already at work around 7:50 that morning. Although counsel was taking the risk that Ford would place Byrd at the scene, it was a calculated risk, since counsel could attack the in-court identification of Byrd by pointing out the inconsistency between Ford's present story and the original story he told police right after the incident. It seems quite reasonable to us that counsel would decide to use Ford's testimony to establish the "yellow car" defense.

Byrd argues that there were other ways counsel could have established the link to Faraby's testimony.[2] In support of this claim, Byrd attached to his petition for habeas corpus copies of police lead sheets reflecting interviews conducted by police with several people on the day of the murders, all of which mention the presence of a yellow car on the parking lot that morning. In addition, Byrd argues, counsel could have produced a videotape made of Ford's original photo identification of the three black men, none of whom was Byrd.

We are not persuaded that the existence of this other potential evidence in any way undermines the reasonableness of counsel's decision to call Ford to give live testimony at Byrd's trial. As a reviewing court, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Here, counsel had taken

---

2. Respondent argues that Byrd is procedurally barred from making this "other evidence" argument because he failed to present the facts to support it to any state court. The District Court agreed, holding that Byrd had not established cause and actual prejudice for his "failure to include that additional factual allegation in his Rule 27.26 motion." 686 F.Supp. at 781. In light of our conclusion, as explained in the text, that the existence of this "other evidence" does not undermine the reasonableness of counsel's decision to call Ford to the stand, we need not consider whether the procedural bar doctrine was properly invoked on this point given the interrelationship of the two arguments. *Cf. Laws v. Armontrout*, 863 F.2d 1377, 1387 n. 10 (8th Cir.1988) (en banc) (in death case, court looks to merits of claim that has "arguable factual commonality" with exhausted claim), *cert. denied*, —— U.S. ——, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989).

**6**

Ford's deposition. He was well aware that Ford would place Byrd at the scene, but he also knew that Ford's testimony could greatly benefit the defense. His decision to call Ford, drawing attention to the fact that the state had declined to call the only witness who was near Pope's Cafeteria when the robbery and murders were perpetrated, was well within the range of options available to a reasonably competent attorney faced with the necessity of constructing a defense in this case. To hold that counsel was not ineffective we need not find that he made the best possible choice, but that he made a reasonable one. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Id.* at 690, 104 S.Ct. at 2066.

■ Similarly, we think that counsel's decision to call Kenneth Ziegler to the stand during surrebuttal was not unreasonable. Ziegler was an investigator with the Public Defender's Office. After Byrd testified that some of the money in his possession when he arrived in Georgia was stolen from a bank bag in a car he had come upon in a parking lot on Olive Street in St. Louis County, the state introduced evidence that no such thefts had been reported from that area. In response, defense counsel called Ziegler, who testified that he also had conducted an investigation but was unable to find any report of such a theft. Byrd contends that Ziegler's testimony undermined his own, and thereby served the state's interests.

The Missouri Court of Appeals, in reviewing the trial court's denial of Byrd's 27.26 motion, found that the "brief testimony of the investigator was offered to counter the suggestion that the evidence of the defendant with regard to the theft was a recent fabrication." 723 S.W.2d at 42. The District Court concluded that this was a state court finding of fact entitled to the 28 U.S.C. § 2254(d) presumption of correctness because it was fairly supported by the record.[3] 686 F.Supp. at 783. *See also Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070. We believe that the District Court's conclusion is clearly correct.

We cannot say that counsel's decision to demonstrate by Ziegler's testimony that Byrd's theft story was not a recent fabrication was unreasonable, especially since the jury already had been informed by the state's evidence that no such theft had been reported. That fact also precludes a finding that Byrd was prejudiced by this decision.

■ We hold that Byrd has failed to demonstrate that he received ineffective assistance of counsel at trial.[4]

## II.

Byrd, who is black, argues that his conviction by an all-white jury violated the Constitution. We disagree.

■ First, because Byrd's conviction was final, in that his conviction had been

---

3. At the 27.26 hearing, Byrd's trial counsel testified that "Mr. Ziegler was called to show, the evidence would show there was no official report, but it was to help construct Maurice's story." 27.26 Tr. at 39. Ziegler also testified at that hearing:

Q. Mr. Ziegler, were you aware in the State's case, we attempted to show that the Creve Coeur police, the area where the money actually [sic] was taken from the car, never actually received a complaint of any theft?
A. I recall that, yes.
Q. Was it your purpose, sir, in doing this investigation, you were called as a rebuttal witness, is that right, in the case?
A. That's my recollection.
Q. And wasn't this to show that the defendant's attorney also was equally aware no theft report had been made, and the purpose

of that was to add to the credibility of defendant's story as to where he got the money from, and further show a story hadn't just been made up that date?
A. I would say that's correct, but I don't recall any specific discussion on the point. 27.26 Tr. at 33.

4. Byrd's claim that counsel was ineffective for not adequately cross-examining several of the trial witnesses as to their interest in a possible reward is procedurally barred, since this claim never was raised in state court. We also reject Byrd's suggestion that the alleged instances of error by counsel cumulatively establish ineffective assistance of counsel. To the contrary, our own careful review of the record satisfies us that Byrd's trial counsel was both diligent and competent.

affirmed by the Missouri Supreme Court and certiorari had been denied by the Supreme Court, before *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was decided, he may not establish a constitutional violation by relying solely on evidence concerning the prosecutor's exercise of peremptory strikes during the selection of the trial jury. *See Allen v. Hardy*, 478 U.S. 255, 258, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986) ("*Batson* should not be applied retroactively on collateral review of convictions that became final before [*Batson*] was announced"). Byrd contends, however, that his death sentence warrants our applying *Batson* to this case despite the clear rule laid down by the Supreme Court in *Allen*. We decline to do so. *Accord Evans v. Cabana*, 821 F.2d 1065, 1068 (5th Cir.), *cert. denied*, 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 795 (1987); *Smith v. McCotter*, 798 F.2d 129, 132 (5th Cir.1986).

■ Second, Byrd has not demonstrated that he is entitled to relief under the pre-*Batson* framework for challenging alleged discriminatory use of peremptory strikes. *See Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). To make a *Swain* case, a petitioner must show that "the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries." *Id.* at 223, 85 S.Ct. at 837.

■ Byrd did not present any evidence to any of the state courts to support a claim under *Swain*. Instead, he made a general argument to the Missouri Court of Appeals that the 27.26 trial court had "plainly erred in concluding that none of appellant's constitutional rights were violated where the trial court's record on voir dire illustrates that the prosecution exercised its peremptory challenges to exclude all four black veniremembers...." Respondent's Exh. H–1 at 13A. The Missouri Court of Appeals, after noting that *Allen* precluded Byrd from making a *Batson* claim, found "no sufficient evidence to support a belief that racial prejudice was a decisive factor in the jury [selection] process." 723 S.W.2d at 42. After including the all-white jury claim in his federal habeas petition, Byrd sought discovery to garner the broader evidence needed to support a *Swain* challenge which the District Court denied.[5]

■ We hold that the District Court properly denied Byrd's discovery request. The exhaustion doctrine precludes a state habeas petitioner from presenting this sort of evidence to a federal habeas court when he could have presented it to the state courts first but did not do so. Byrd has offered no cause for his failure to present evidence in support of his *Swain* claim to the state courts, as he must to overcome the procedural bar created by that failure. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977) (habeas petitioner must show cause and prejudice to overcome procedural bar to presentation of defaulted claim).[6]

Our review therefore is limited to the same record that the Missouri Court of Appeals had before it—the transcript of Byrd's trial and the prosecutor's exercise of peremptory challenges in that trial alone. That evidence clearly is insufficient to warrant relief under *Swain*. *See, e.g., United States v. Childress*, 715 F.2d 1313,

---

5. Among other things, Byrd sought statistical evidence as to the racial composition of St. Louis County petit juries and the use of peremptory strikes by members of the St. Louis County prosecutor's office.

6. Relying upon *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984), Byrd argues that the *Wainwright* "cause and prejudice" test is met in this case since his 27.26 appeal brief was filed only one day after *Allen* was decided, thereby justifying counsel's reliance on *Batson* evidence alone to state the constitutional challenge. *Reed*, which held that *Wainwright* cause can be established by the novelty of a legal claim, does not support such an argument. Far from being novel, the legal framework for a discrimination claim under *Swain* had been in place for over twenty years at the time Byrd was pursuing state post-conviction relief.

1321 (8th Cir.1983) (en banc), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984). We hold that Byrd is not entitled to relief on his claim regarding the racial composition of his jury.

### III.

Byrd also claims newly discovered evidence as a basis for relief. More than four years after Byrd's trial, an attorney representing him in his 27.26 appeal received a phone call from a woman whose identity remains undisclosed. "Anita," a West County housewife and frequent shopper at West County Shopping Center, met with the attorney and related the following: Early on the morning of October 23, 1980, she went to the West County Shopping Center to return some shoes. She noticed a "whitewashed" panel truck on the parking lot not far from Pope's. While still on the parking lot, she saw two black men come out of the shopping center exit by Pope's, putting on white coverall jumpsuits. One man was carrying a white sack. As they approached, she asked them if the shopping center was open and they said it was not; one man offered to let her in but the other was in a hurry to leave. The men then left in the panel truck. Byrd, whose face was familiar to "Anita" from his prior work at the shopping center, was not one of the two men she saw.

■■■ Byrd argues that this new evidence entitles him to federal habeas relief.[7] We conclude, however, that Byrd's argument lacks a constitutional basis.

■■■ It has been well-established since *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), that the "claim of newly discovered evidence relevant to the guilt of a state prisoner is generally not a ground for relief on federal habeas corpus," *Mastrian v. McManus,* 554 F.2d 813, 822 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977), unless it bears upon the constitutionality of the petitioner's detention. Byrd argues that the absence of a state court in which the new evidence can be heard violates either the Eighth Amendment or the Due Process Clause. We disagree. There is no constitutional requirement that a state provide even an opportunity for appeal of a criminal conviction, *see Evitts v. Lucey,* 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985), let alone a court procedure for receipt of evidence years after a conviction was entered. We also point out that the discovery of this evidence does not impugn the constitutionality of the process by which Byrd's conviction was obtained four years before "Anita" came forward.

In any event, we disagree with Byrd's argument that the new evidence is inconsistent with Byrd's guilt. Even assuming the truth of the facts Byrd asserts would be added by Anita's testimony[8] and considering those facts in conjunction with the other evidence at trial, it does not follow, as Byrd argues, that he would probably be acquitted. As the District Court stated, "[t]he fact that petitioner was not one of two men dressed as painters leaving the Mall exit near Pope's Cafeteria before 7:45 a.m. on October 23, 1980, does not mean that petitioner did not commit the robbery and murders at Pope's Cafeteria that morning." 686 F.Supp. at 762. We cannot conclude that this new evidence would "probably produce an acquittal on retrial." *Mastrian,* 554 F.2d at 823. We therefore hold that Byrd is not entitled to federal habeas corpus relief on the basis of newly discovered evidence.

7. We reject respondent's argument that Byrd faces a procedural bar on this point because he failed to apply for executive clemency based on the newly discovered evidence. The exhaustion doctrine and the corresponding doctrine of procedural bar require that state prisoners exhaust state *court* remedies before petitioning for federal habeas corpus.

8. Byrd complains that the District Court should not have considered the impact of "Anita's" proposed testimony based only on the affidavit of the 27.26 appeal attorney, but rather should have held an evidentiary hearing on the issue. As explained in the text, however, Byrd has failed to show a constitutional foundation for habeas relief on this issue; it therefore would have been improper for the District Court to hold such a hearing.

## IV.

Byrd claims entitlement to relief under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which teaches that venirepersons may not be excluded for cause because of their general opposition to the death penalty unless they indicate "that they would not even consider returning a verdict of death." *Id.* at 520, 88 S.Ct. at 1776. The constitutional standard is whether a prospective juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 433, 105 S.Ct. 844, 857, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).

Two prospective jurors in Byrd's trial were excluded under *Witherspoon* because each responded negatively to a question whether they could consider the two forms of punishment, life imprisonment and death, authorized by Missouri law upon a conviction of capital murder. The questions asked these venirepersons did not exceed the permissible scope authorized by *Witherspoon*. We conclude that Byrd's constitutional rights were not violated by the striking of these jurors for cause from the guilt phase of his trial. *See Lockhart v. McCree*, 476 U.S. 162, 165, 106 S.Ct. 1758, 1760, 90 L.Ed.2d 137 (1986).

## V.

Byrd raises a series of challenges to various evidentiary rulings made by the trial court and approved by the state appellate courts. Many of these issues concern the testimony of Byrd's purported second wife, Sandra Sanders Byrd. Byrd claimed to have been married to Sandra since 1978, though he had not at that time obtained a divorce from his first wife, Evelyn McQueen. At trial, the prosecution called Sandra to the stand. In a tape-recorded, unsworn pretrial statement, Sandra had said Byrd told her that he had killed three people to be in Georgia with her and their baby. On the stand, however, Sandra denied that Byrd ever had said any such thing. The prosecutor attacked her testimony by playing the tape of her pretrial statement. When Sandra refused to change her testimony, he had her arrested and charged with perjury. The next day, the prosecution again called Sandra to the stand, and she testified in accordance with the taped statement.

Byrd contends that Sandra should have been prevented from testifying because of the marital privilege. The admissibility of evidence in a state proceeding is a matter of state law. The Missouri Supreme Court, which has the final say on questions of Missouri law, held that the marital privilege did not preclude Sandra's testimony because she never had been lawfully married to Byrd. That pronouncement ends our inquiry, since Byrd has not shown that this evidentiary ruling "infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process." *Turner v. Armontrout*, 845 F.2d 165, 169 (8th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 315, 102 L.Ed.2d 333 (1988).

Even had there been a misapplication of Missouri law regarding marital privilege, it would not have raised any due process concerns. To evaluate the due process implications of an alleged state court misapplication of evidentiary privilege, it is necessary to examine the policy underlying the particular privilege. The justification for the privilege against adverse spousal testimony "is its perceived role in fostering the harmony and sanctity of the marriage relationship." *Trammel v. United States*, 445 U.S. 40, 44, 100 S.Ct. 906, 909, 63 L.Ed.2d 186 (1980). The same policy underlies the narrower rule that confidential communications between husband and wife are inadmissible. *See Wolfle v. United States*, 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934); *see also State v. Byrd*, 676 S.W.2d at 501 (privilege protecting marital communications "is intended to encourage full disclosure and trust between the parties to a marriage"). The policies furthered by proper application of the marital privilege in any of its forms are quite distinct from the concerns for fairness and

reliability protected by the Due Process Clause. Thus, Byrd's argument that the privilege was misapplied, even if it were correct, would not establish a constitutional due process violation.

■■■ We are also unable to find constitutional error with regard to the state's treatment of Sandra Byrd as a hostile witness, its use of her previously recorded unsworn statement to impeach her testimony, or its decision to charge her with perjury following her first day of testimony. Byrd has failed to show that any of these purported errors deprived him of any federal constitutional right.[9] The jury was able to observe both days of Sandra Byrd's testimony and was made aware of the perjury charge leveled against her. It was for the jury to decide which of her stories, both given under oath, they would believe.[10]

### VI.

■■■ Byrd argues that his constitutional rights were violated because "the death penalty is sought and inflicted disproportionately against blacks in Missouri." Appellant's Brief at 58. In *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Supreme Court held that to prevail on such a claim, a habeas petitioner must "prove that the decision-makers in *his* case acted with discriminatory purpose." *Id.* at 292, 107 S.Ct. at 1766 (emphasis in original). Byrd invites this Court to use the *Batson* doctrine, *see* part II *supra*, to conclude that he has met the evidentiary burden set up by *McCleskey*. This we decline to do. Byrd's argument

assumes that because the prosecutor used some peremptory strikes against blacks, this somehow indicates that the state's decision to seek the death penalty was motivated by racial prejudice. We are not willing to make such an assumption, nor does Byrd point to any case in which such an assumption has been made. Indeed, we think it far more reasonable to assume that the state sought the death penalty in this case because of the viciousness and utter depravity of the crimes committed.

### VII.

■■ Byrd next requests that we find a due process violation in the way the trial court handled voir dire. After denying Byrd's request for sequestered individual voir dire regarding death qualification and pretrial publicity, the trial court followed a procedure that allowed for individual voir dire of those veniremembers who indicated familiarity with the case through pretrial publicity. Initially, however, the veniremembers were questioned in panels of twelve. The death qualification process also took place in panels of twelve, a practice that is constitutionally permissible. *See Trujillo v. Sullivan*, 815 F.2d 597, 606–07 (10th Cir.), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987) (individual sequestered voir dire during death qualification is not constitutionally mandated). After carefully reviewing the record, we conclude that the procedure followed by the trial court in conducting voir dire fully satisfied the requirements of due process.

---

**9.** Byrd cites several cases involving federal criminal prosecutions, over which we exercise supervisory control. Those cases do not support his argument that his state court conviction should be overturned for constitutional error.

**10.** Byrd also claims that his due process rights were violated by the admission of the testimony of witnesses who had been hypnotized. As to Lori Robinette, we agree with the District Court that because hypnosis did not affect her testimony on any major point, any error with regard to its admission would fall short of constitutional magnitude. *See* 686 F.Supp. at 770–773. Byrd's argument that the testimony of Oscar Ford should have been excluded because he had been hypnotized, even though he was put on the

stand by the defense, is also unavailing. The trial court had no obligation to exclude Ford's testimony *sua sponte* under Missouri law at the time of trial. *Cf. Alsbach v. Bader*, 700 S.W.2d 823 (Mo.1985) (en banc) (holding that testimony of witnesses who have undergone hypnosis is no longer admissible). Indeed, had Byrd been prevented from using Ford's testimony, he might well have complained that his constitutional right to present testimony in his own behalf was infringed. *See generally Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (state's absolute bar to admission of a criminal defendant's hypnotically refreshed testimony violated her right to testify in her own defense).

In pressing this due process claim, Byrd contends that he was prejudiced by the statement of a veniremember, made in the presence of other members, that he was aware that Byrd had been arrested in Georgia for murder. Even disregarding the fact that the statement of the juror was made in response to questioning by Byrd's own counsel, we agree with the Missouri Supreme Court that the statement did not prejudice Byrd.[11]

## VIII.

During the sentencing phase of Byrd's bifurcated trial, his counsel informed the trial court that he intended to offer testimony of a Mr. Coble that Byrd had been nominated for a good citizenship award in connection with assistance he had given the police in investigating a burglary. The trial court made an *in limine* ruling that if the witness were called, the state would be allowed to cross-examine the witness as to his knowledge of Byrd's various arrests. Byrd's counsel decided not to call the witness. Byrd now contends that he was prevented from establishing a mitigating factor in violation of the Supreme Court's decisions in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). We find no merit in this contention.

As the District Court noted, the trial court "did *not* rule that petitioner could not present Coble's testimony. Rather, the trial court ruled that if petitioner did present Coble's testimony, then the state would be permitted to cross-examine Coble." 686 F.Supp. at 774 (emphasis in original). Byrd could have offered the testimony and then objected to any cross-examination that exceeded its permissible scope under Missouri law. It was the decision of the defense not to offer Coble's testimony.

## IX.

Byrd's final contention is that the alleged errors in his trial cumulatively entitle him to federal habeas corpus relief. Because

"[e]ach claim of constitutional deprivation ... must stand on its own," *Lee v. Lockhart*, 754 F.2d 277, 279 (8th Cir.1985), we reject this claim as well. *See Cooley v. Lockhart*, 839 F.2d 431, 432 (8th Cir.1988).

The judgment of the District Court is AFFIRMED.

---

11. The Missouri Supreme Court noted that the jury could "reasonably assume" that Byrd "was arrested for these killings while he was still in Georgia." 676 S.W.2d at 500.