**James W. CHAMBERS, Appellant,**

v.

**Bill ARMONTROUT, Appellee.**

No. 88–2383.

United States Court of Appeals,
Eighth Circuit.

Submitted March 16, 1989.

Decided Sept. 15, 1989.

Order on Grant of Rehearing En Banc
Nov. 8, 1989.

Thomas R. Schlesinger, Chesterfield, Mo., for appellant.

Patrick L. King, Jefferson City, Mo., for appellee.

Before JOHN R. GIBSON, Circuit Judge, and FLOYD R. GIBSON and HEANEY, Senior Circuit Judges.

HEANEY, Senior Circuit Judge.

James Chambers appeals his conviction and death sentence for the capital murder of Jerry Lee Oestricker. We reverse because Chambers received ineffective assistance of counsel when his counsel for his second trial failed to interview or to call a witness who would have testified that Chambers acted in self-defense.

## I. BACKGROUND

In December of 1982, James Chambers was tried for the murder of Jerry Lee Oestricker in the Circuit Court of Jefferson County, Missouri. At this trial, two eyewitnesses gave conflicting versions of the events immediately preceding the moment that Chambers shot and killed Oestricker outside a bar in Arnold, Missouri.

The government's eyewitness, Fred Ieppert, testified that he saw Chambers first strike Oestricker with a pistol, knocking Oestricker to the ground. Ieppert testified that he then saw Oestricker stand up with his hands in the air, Chambers point the pistol at Oestricker and Chambers fire a single shot into Oestricker's chest.

James Jones, the other eyewitness, had left the bar several minutes before the shooting but had to wait in his car in the bar's parking lot because his engine was flooded. He testified at the first trial to the following: (1) the smaller man (Chambers) came out the bar door first, walked about half the distance of a truck and stood facing the bar door; (2) the bigger man (Oestricker) followed; (3) the two men argued; (4) Oestricker went towards Chambers and struck Chambers in the face, knocking Chambers to the ground; and (5) Chambers stood up and shot Oestricker.

At the first trial, Chambers' attorney requested submission of a self-defense instruction to the jury. The trial court refused, but the court did instruct the jury in the lesser charges of murder in the first and second degree, as well as capital mur-der. The jury found Chambers guilty of capital murder and sentenced him to death.

On appeal, the Missouri Supreme Court reversed the conviction. *State v. Chambers*, 671 S.W.2d 781 (Mo. banc 1984) (*Chambers I*). It held that there was sufficient evidence to justify an instruction on self-defense, pointing specifically to Jones' testimony that Oestricker struck Chambers in the face. *Id.* at 783. The court held that a jury could reasonably conclude that Oestricker was the initial aggressor and that Chambers may have shot Oestricker because Chambers feared great bodily harm. *Id.*

Chambers was retried in Jefferson County. His newly appointed counsel for the second trial was Donald W. Hager, a public defender. Hager neither interviewed Jones before trial nor called him to testify on behalf of Chambers. At the conclusion of evidence, Hager requested a self-defense instruction. As with the first trial, the trial court refused. Moreover, Hager was not permitted to argue self-defense in his closing argument. The second trial also resulted in a conviction for capital murder and a sentence of death.

With the assistance of yet another attorney, Chambers again appealed to the Missouri Supreme Court. This time, however, the court affirmed the conviction and death sentence. *State v. Chambers*, 714 S.W.2d 527 (Mo. banc 1986) (*Chambers II*) (Donnelly, J. and Welliver, J., dissenting).

On November 12, 1986, Chambers filed a motion in the Circuit Court of Jefferson County under Missouri Rule 27.26. A hearing on this motion was held on February 3, 1987. The issues raised at this hearing included whether Chambers received ineffective assistance of counsel at his second trial because Hager failed to interview or call Jones at trial. At this hearing, Jones gave a similar account of the incident to the account that he had given at Chambers' first trial. Jones also testified that neither Hager nor anyone else from the public defenders' office had contacted him since the first trial.

Hager also testified at the Rule 27.26 hearing. He conceded that Jones was not

contacted by him or anyone else in the public defenders' office. Hager stated that he did not interview or call Jones at trial because he felt that Jones' testimony at the first trial contained aspects which were very damaging to Chambers. Hager testified that Jones would testify that Chambers stepped outside first, stopped, turned, and waited for Oestricker, concealing a pistol against his leg, that Chambers pistol-whipped Oestricker and shouted, "Lay there and die," that Oestricker was six feet away and not moving towards Chambers at the time of the shooting, and that Chambers left the scene in a car that was facing the road with its engine running.

Chambers' Rule 27.26 motion was denied by the Circuit Court of Jefferson County. His appeal of that ruling was denied by the Missouri Court of Appeals, and his application for transfer to the Missouri Supreme Court was denied.

Chambers next filed a petition for a writ of habeas corpus in federal court. On habeas, Chambers alleged, *inter alia,* that he was denied effective assistance of counsel at the second trial because Hager failed to interview or call Jones at trial. The district court held that Hager's performance was above that of a reasonable attorney. In specific reference to Hager's decision not to interview or call Jones at trial, the court concluded that this decision was reasonable because of the damaging aspects of Jones' testimony during the first trial, Jones was not a credible witness, and Chambers signed a pretrial statement in which he agreed with Hager's decision not to call Jones at trial.

Chambers appeals the district court's decision to this Court. On appeal, he raises only one issue that merits our attention: Did Hager's decision not to interview or to call Jones at trial deny Chambers effective assistance of counsel? [1]

## II. DISCUSSION

Under the standards for analyzing a claim of ineffective assistance of counsel, enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Chambers must show that Hager's performance was deficient and that it prejudiced Chambers' defense. *Id.* at 687, 104 S.Ct. at 2064. Counsel's performance is deficient if the performance is less than that provided by reasonable counsel under the same circumstances. *Id.*

██ Chambers alleges that Hager's decision not to interview or call Jones at trial was unreasonable for three reasons. First, Hager's testimony, confirmed by the facts of the case, indicates that there was only one defense on which Chambers could rely. From this, Chambers asserts that Hager's failure to investigate Jones or to call him at trial left Chambers with no defense to capital murder. Second, the seriousness of the charges against Chambers must be considered in assessing the reasonableness of Hager's decision. Finally, an interview with Jones would have given Hager an opportunity either to confirm or to clarify the problems he saw in Jones' testimony at the first trial and to be more effective in his cross-examination of the government witnesses.

We are guided in our determination of whether Hager was reasonable in deciding not to interview or call Jones at trial by the Supreme Court's decision in *Strickland.*

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

---

**1.** Chambers also raises two other issues: (1) Hager's decision not to interview or call as witnesses Donald Chapman, Eleanor Hotchkiss and Jackie Turner denied Chambers effective assistance of counsel, and (2) Chambers was denied a fair trial by the trial court because it failed to submit a self-defense instruction to the jury. As to the former issue, we have carefully examined the record and find that it is without merit. As to the latter issue, the trial court was correct not to submit the self-defense instruction in light of the fact that, absent Jones' testimony, there is insufficient evidence to support the theory that Chambers acted in self-defense.

investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91, 104 S.Ct. at 2066.

The question before us is whether Hager's less than complete investigation of Jones was reasonable from counsel's perspective at the time that decision was made. In this regard, we must set forth the factual circumstances that a reasonable attorney would have known from the first trial and the likely path the second trial would take.

Chambers has never disputed shooting Oestricker. Chambers has never asserted that he and Oestricker did not argue with each other in the bar. Chambers has never disputed that both he and Oestricker challenged each other to a fight. Chambers did dispute, however, the government's theory that the fight was a ruse on Chambers'

part to lure Oestricker outside where he could murder him. Moreover, there was no indication from the state that the testimony at the second trial would significantly differ from the testimony given at the first trial. From this background, reasonable counsel would have anticipated that Chambers' second trial would proceed much like the first trial.

In light of the above facts, we believe that Hager's determination that the negative aspects of Jones' testimony outweighed the positive aspects was unreasonable because the damaging portion of Jones' testimony was either cumulative of earlier testimony given by witnesses for the state or of *de minimis* effect.[2] Several witnesses testified that Chambers left the bar first and waited for Oestricker. James Fowler, a bar patron, testified that, as the defendant left the bar, he pulled out a gun and then concealed it from view with his body as he waited outside for Oestricker. *State of Missouri v. Chambers*, No. 64709, T. at 505–07 (*Chambers I*, T.);[3]

---

2. The only damaging testimony of Jones not directly testified to by one of the state's witnesses is that the engine in the waiting car was running and the car was parked in such a manner to permit an immediate exit. Both of these facts, however, were implicit in Dennis Simmons' testimony. Simmons, who was standing about 150 feet from the bar and whose attention was caught by the sound of the gun, testified at the first trial that Chambers ran to a "waiting" car, which sped off immediately. *Chambers I*, T. at 656–57. Simmons also testified that the driver was waiting in the car. Simmons' testimony was not contradicted nor was he extensively cross-examined as to these points. Moreover, reasonable counsel would have concluded that the damaging effect of this testimony, in light of the information available to Hager at the time he made this decision, would have been *de minimis*.

3. Fowler's relevant testimony at the first trial proceeded as follows:
   Q [Mr. Finnical, the prosecutor] Did you have an unobstructed view out the door or was it blocked?
   A Straight view.
   Q Did you see Chambers walk outside?
   A Yes, sir; I did.
   Q What, if anything, did you see Chambers do when he walked outside?
   A As he walked out the door, he made about three or four, maybe five steps. He stepped, had both hands in front of him, more

or less turned mostly to the left, the left of his body turned toward the door.
   He reached in the front of his shirt, pulled up, I don't know if he grabbed with his right hand or left hand, but he pulled a revolver out of the front of his pants.
   He looked back over his shoulder, took two more steps, looked over his shoulder again, and I seen the barrel.
   He cocked it, put it down to his side, towards his chest; then he started down toward his side.
   Q How far was Chambers outside the door when he finally stopped?
   MR. ALLRED [Chambers' counsel]: Object to that. He testified to it. It's repetitious.
   THE COURT: Overruled.
   Q (By Mr. Finnical) How far outside the door was Chambers when he stopped?
   A Approximately twelve foot or so.
   Q Twelve foot. Okay. So, if this is the door through which Chambers walked going out that way, I want you to stand out here and walk, do what you saw Chambers walk and do.
   A He walked out one, two, three steps, turned around, looked, raised up his shirt, pulled the pistol out, made two more steps, left side back, cocked it, set the gun to his side, then brought it back down to his side. How did he position his body to the door?
   A You could see most of his left side at an angle, more of his left side than his full back.
   Q Was he looking back or looking towards the parking lot?

*State of Missouri v. Chambers,* No. 67191, T. at 586–88 (*Chambers II,* T.). Fred Ieppert testified that Chambers had a gun at his side. *Chambers I,* T. at 466. Other witnesses testified at both trials that Chambers was pulling a "knife or something" out of his pants as he was leaving. Several witnesses testified that Chambers pistol-whipped Oestricker. *Chambers I,* T. at 465, 508, 556, 645, 654 and 689; *Chambers II,* T. at 374–77, 420, 458, 501, 524, 540–41 and 590. Fred Ieppert also testified in the first trial that, after Chambers had knocked Oestricker down to the ground and Oestricker stood up, Oestricker was six feet away and standing when Chambers shot him. *Chambers I,* T. at 464. *See also Chambers II,* T. at 447 (testifying that the distance separating the two was five feet). Numerous witnesses testified that Chambers shouted several epitaphs after shooting Oestricker. *Chambers I,* T. at 466, 509, 542, 566, 680 and 700; *Chambers II,* T. at 330, 360, 375, 420–21, 508 and 591. In sum, other witnesses had testified to the negative aspects of Jones' testimony. Thus, any damaging testimony that Jones gave at the first trial was cumulative.

The state also argues that Hager's decision not to interview Jones was reasonable because Hager's determination that Jones lacked credibility was reasonable. We do not agree. Hager never met Jones nor spoke with him on the telephone. The state fails to point out any evidence upon which a reasonable attorney could determine a witness' credibility. Moreover, the government made no attempt to impeach Jones at the first trial, a fact that is inconsistent with Hager's determination that Jones lacked credibility. Furthermore, the Missouri Supreme Court obviously did not view Jones as a witness who lacked credibility because it based its decision in *Chambers I* on his testimony alone.

This is not a case where further investigation of a potential defense was unnecessary because counsel reasonably intended not to use that defense at trial. *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. The self-defense theory, as either a partial or total defense, was Chambers' only possible defense during either the merits phase or the sentencing phase. This is also not the case where the defendant gave his attorney reason to believe that pursuing certain investigations would be fruitless or even harmful. *Id.* Chambers' signed statement, in which he agreed with Hager's decision not to call Jones,[4] fails to make Hager's conduct reasonable. First, Hager did not rely on Chambers' statement because the text clearly indicates that Hager had already made the decision not to call Jones. Second, even if he had relied on Chambers' advice, rather than using his own professional judgment, Hager's con-

A   He was looking back at the door.
Q   After you saw him cock the gun and put it next to his chest and come to a stop, could you see the gun or was it obstructed by his body?
A   It was obstructed by his body.
Q   When Chambers walked out of the door and proceeded to get this pistol and proceeded a couple more steps and cocked it—
MR. ALLRED: Object to the leading questions, your Honor.
THE COURT: Overruled.
Q   (By Mr. Finnical) Where was Oestricker at the time Chambers was outside with the pistol like this? Was he still inside or outside?
A   He was outside, sir.
Q   Where would you say he was?
A   Approximately right in here.
Q   Did Oestricker have anything in his hands as he walked out the door?
A   No, sir; he didn't.
Q   Did Oestricker subsequently walk out the door?

A   Yes, sir.
Q   Was Chambers still standing out there twelve or so feet out?
A   Yes, sir.
Q   What did you do then?
A   I see him pull the pistol and an older man standing next to me hollered out: "He's got a knife."
Q   What happened then?
A   About the time Oestricker walked out the door I said: "Knife, hell; he's got a gun."

4.   Chambers' signed statement is as follows:
    I agree that Mr. Hager need not subpoena or call James Jones at my trial. His cross examination at the first trial was extremely damaging to me and I believe it would be at the second trial. I have been admonished that by not calling James Jones it may not be possible to obtain a jury instruction on self defense.
    4/13/85   /s/ James W. Chambers

duct would violate Missouri's Rule of Professional Conduct 1.2(a).

Hager's decision not to call Jones at trial and to rely only on his ability to cross-examine the state's witness in Chambers' defense, given the facts at the time of the second trial, was unreasonable. The decision manifested both arrogance and a failure to adequately appraise his client's situation. The only evidence supporting either the self-defense theory or a verdict of guilty of a lesser included offense which Hager could have elicited on cross-examination was that Oestricker was bigger than Chambers and that Oestricker was "crazy drunk" and spoiling for a fight. No other witness was prepared to testify that Oestricker knocked Chambers down before the shot was fired. In addition, Hager's decision not to call Jones was based on inadequate investigation. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066–67 ("strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation"). Moreover, the Missouri Supreme Court implicitly advised Chambers' counsel to call Jones to testify at his second trial. *Chambers I,* 671 S.W.2d at 783.

Thus, both Hager's decision not to interview Jones and his decision not to call Jones at trial were unreasonable and, thereby, meet the "deficiency" prong of *Strickland.* Only Jones' testimony in the first trial contradicted the state's theory of the case. Only Jones' testimony in the first trial—albeit with the exception of testimony about the argument in the bar and testimony about the differences in size between the two men—provided Chambers with evidence that he killed Oestricker in self-defense. The Missouri Supreme Court had stated that something more than the barroom argument and the differences in

physical size—something indicating the immediacy of danger—had to be present to justify a self-defense instruction. *Chambers I,* 671 S.W.2d at 783. Only Jones' testimony in the first trial indicated that there was this immediacy of danger. Nothing in Jones' testimony at the first trial was sufficiently damaging to Chambers, in light of the other testimony, that reasonable counsel would have been justified in not calling Jones. Hager had at his disposal the address and phone number of Jones and a paid investigator was available to locate, interview and subpoena Jones. Most importantly, the second trial was likely to proceed in a similar fashion as the first trial, but Hager unreasonably failed to follow the Missouri Supreme Court's implicit advice in *Chambers I.*[5]

The question remains whether, in light of all the circumstances, Hager's ineffective assistance of counsel resulted in any prejudice. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors," the "result would have been more favorable to the defendant." *Id.* at 694–95, 104 S.Ct. at 2068–69; *Sanders v. Trickey,* 875 F.2d 205, 208 (8th Cir.1989). This standard for determining prejudice is somewhat lower than the preponderance of the evidence standard. *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068; *Byrd v. Armontrout,* 880 F.2d 1, 4 (8th Cir.1989).

Jones' testimony had the potential to greatly aid Chambers' case. Jones was a fully disinterested witness who testified that Oestricker hit Chambers before the shot was fired. The only facts that were overwhelmingly conclusive at the second trial were that Chambers and Oestricker engaged in a loud argument, that Cham-

---

5. Judge Blackmar of the Missouri Supreme Court noted this point in his concurring opinion in *Chambers II.*

There is a mystery as to why the evidence that the victim struck the defendant, knocking him to the ground, which was held to require a self-defense instruction in the first trial, was not offered in the second.

*Chambers II,* 714 S.W.2d at 534 (Blackmar, J., concurring). In dissenting from a holding that there was insufficient evidence at the second trial to justify submission of a self-defense instruction, Judge Welliver of the Missouri Supreme Court stated, "The principal opinion, I fear, becomes the best evidence for proof of a charge of ineffective counsel." *Id.* (Welliver, J., dissenting). We agree.

bers shot Oestricker, and that Chambers struck Oestricker in the face with his pistol after shooting him. Chambers did not contest those issues. Rather, Chambers argued that he acted in self-defense or with legal provocation contesting the state's theory that the barroom brawl was just a ruse in Chambers' premeditated and deliberate murder of Oestricker. Only Jones' testimony substantially supported either approach.

■ Nevertheless, Missouri argues that Chambers cannot make a showing of prejudice because the other evidence against him was sufficiently impressive that his failure to call Jones was not likely to have altered the outcome of the case. Missouri also argues that *Strickland* does not stand for the principle that the reasonable probability of being found guilty of a lesser charge is prejudice.

Missouri's arguments against a finding of prejudice represent misreadings of *Strickland*. *Strickland* does not require Chambers to prove that Jones' testimony would have likely affected the outcome. "[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. at 2068. *Strickland* merely requires "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Thus, Chambers does not have to prove that Hager's ineffective assistance of counsel was outcome determinative. As to the lesser charge issue, Missouri's interpretation conflicts with language in *Strickland* focusing on the "likelihood of a result more favorable to the defendant." *Id.* at 695, 104 S.Ct. at 2068. Moreover, the state's version is incongruent with the Supreme Court's explicit recognition that prejudice can occur in sentencing alone. *Id.* If a smaller sentence is prejudice, then a conviction of a lesser charge resulting in a smaller sentence also constitutes prejudice.

Considering all the circumstances, there is a reasonable probability that, absent Hager's decision not to interview or call Jones at trial, the jury would have acquitted Chambers of capital murder, either by finding him guilty of a lesser charge or by finding that he acted in self-defense.

## III. CONCLUSION

At the time of the second trial, this case appeared to involve a barroom brawl or altercation. Chambers did not, and could not, deny shooting Oestricker. His only defense to the charge of capital murder and the death penalty was that he acted in self-defense. Only one witness could testify to one of the required elements of self-defense to justify submitting the issue to the jury. That witness' harmful testimony would have appeared to reasonable counsel at the time of the second trial to be cumulative. Yet, Chambers' counsel did not interview or call this witness to the stand, although he knew of his existence and testimony and was able to contact him. On these facts, we hold that Chambers received ineffective assistance of counsel. In our view, there is a reasonable probability that, absent this error, Chambers would not have been convicted of capital murder. Therefore, we reverse and remand to the district court to enter an order that the state either retry Chambers within 120 days of this order or free him from custody. The district court shall further order that the state shall notify this court and the district court of its intention in this regard within 45 days of this order.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent.

The court today concludes that trial counsel Hager's failure to interview Jones or to call him as a witness at trial constituted ineffective assistance of counsel under *Strickland*'s tests for reviewing claims of ineffective performance and prejudice. Because I conclude that neither element of the *Strickland* test is satisfied, I would affirm the judgment of the district court denying the writ.

The decision of the Missouri Supreme Court in its consideration of the facts in the case clearly indicates that evidence to support the self-defense instruction could have

come only from Jones,[1] and we know from the record that Jones was not called to testify at the second trial. However, the state trial court, in considering the collateral attack under Missouri's Rule 27.26, concluded that Jones' testimony, on balance, was more damaging than helpful to Chambers. After observing that counsel "could cho[o]se between a weak self-defense theory that carried with it a strengthening of the State's case," or try the case as he did, the state court concluded that the decision not to call Jones was a reasonable one.[2] The Missouri Court of Appeals affirmed the conviction, *Chambers v. State*, 745 S.W.2d 718 (Mo.Ct.App.1987), and Chambers' application for transfer to the Missouri Supreme Court was denied. The district court, in this habeas corpus action, concluded that Jones' testimony would have supported the state's theory of the case. It also concluded that because the trial counsel's failure to investigate further resulted from a strategic decision made in the exercise of professional judgment, his performance was not deficient. Because it decided that the trial counsel rendered effective assistance, the district court did not reach the question of prejudice.[3]

## I.

The effectiveness component of the *Strickland* test asks whether the defendant received "reasonably effective assistance." 466 U.S. at 687, 104 S.Ct. at 2064. Moreover, *Strickland* teaches that judicial scrutiny of counsel's performance must be

---

1. The Missouri Supreme Court, in reversing the *Chambers I* trial, observed that there was conflicting evidence as to the incident and that "[i]n examining the record for evidence of self-defense, we must consider the evidence in [the] light most favorable to appellant Chambers." *State v. Chambers*, 671 S.W.2d 781, 783 (Mo. 1984) (en banc). After reviewing the evidence in that manner, the court concluded that "[w]hile the evidence of self-defense is not so unequivocal as to mandate a directed verdict of acquittal, the evidence is sufficient to justify submission of self-defense to the jury." *Id.* at 784.

2. The detailed reasoning of the state trial judge is as follows:

> During this proceeding, Donald Hager testified that the decision not to call Jones was [a] deliberate one, based upon strategic concerns. That, having the benefit of Jones' testimony on cross-examination adduced at the first trial, in his professional opinion, the disadvantages of Jones' testimony outweighed the advantages. The State's cross-examination * * * was highly damaging in that it supported the State's theory of the case under a capital murder submission. Mr. Hager knew that although Jones' testimony would have supported a self-defense instruction, it corroborated the State's main witness—Fred Ieppert—and conflicted with his defense strategy. His strategy at trial was to: 1) attack the credibility of the State's witnesses; 2) suggest that Oestricker had a pair of pliers in his hands; and 3) attempt to negate the element of Chambers reflecting "cooly" upon * * * taking the life of Oestricker. The fact that Jones was in a position to observe the condition of the getaway car with running engine and the distance between the victim and petitioner at the time of the fatal shot would have

made this trial strategy almost impossible from a practical standpoint.

> * * * * * *

> Without Jones' testimony a jury might believe, as at least one [Missouri] Supreme Court Judge did, that the whole matter was just "an ordinary barroom altercation" thus negating the cool reflection that might not exist under those circumstances.

> * * * * * *

> In light of the foregoing, the Court finds that petitioner's trial counsel's decision not to call Jim Jones was a reasonable one based on his professional judgment in consideration of the evidence and the circumstances in the first trial.

*Chambers v. Missouri*, No. CV186–4580–CC–J3, slip op. at 12–13 (23d Cir.Ct. March 11, 1987). The court also rejected Chamber's claim that he had not read the signed statement which indicated that he agreed with the decision not to call Jones. *Id.* at 14 n. 2.

3. The district court's reasoning is of interest:

> The Court finds reasonable counsel's conclusion that Jones' testimony would have tended to support the state's theory of the case and thus his decision not to call Jones as a witness. This is especially true in view of petitioner's written and signed pretrial statement that he agreed with counsel's decision in this regard. As the United States Supreme Court noted, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the petitioner's own statements or actions." *Strickland, supra,* 466 U.S. at 691 [104 S.Ct. at 2066]. Furthermore, counsel reasonably assessed the affect [sic] of Jones' earlier testimony on both the state's theory of the case and Jones' credibility as a witness.

*Chambers v. Armontrout*, No. 88–0567C(3), slip op. at 12 (E.D.Mo. July 19, 1988).

"highly deferential," *id.* at 689, 104 S.Ct. at 2065, and should eliminate the "distorting effects of hindsight," *id.*

In performing the first part of the *Strickland* analysis, courts distinguish between pretrial preparation and trial strategy decisions. *See Burger v. Kemp*, 483 U.S. 776, 788–95, 107 S.Ct. 3114, 3122–26, 97 L.Ed.2d 638 (1987); *Kimmelman v. Morrison*, 477 U.S. 365, 384–87, 106 S.Ct. 2574, 2587–89, 91 L.Ed.2d 305 (1986); *Darden v. Wainwright*, 477 U.S. 168, 184–87, 106 S.Ct. 2464, 2473–75, 91 L.Ed.2d 144 (1986); *Strickland*, 466 U.S. at 687–91, 104 S.Ct. at 2064–67; *United States v. Gray*, 878 F.2d 702, 711 (3d Cir.1989); *Laws v. Armontrout*, 863 F.2d 1377, 1382–86 (8th Cir.1988) (en banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 1944, 104 L.Ed.2d 415, *reh'g denied*, —— U.S. ——, 109 S.Ct. 3179, 104 L.Ed.2d 1041 (1989). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. The Third Circuit recently stated: "Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Gray*, 878 F.2d at 711.

In contrast to the relatively close scrutiny which courts give to an attorney's preparatory activities, greater deference is given to an attorneys' informed strategic choices. Indeed, it has been clear since *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. In reviewing the performance of counsel, "courts must resist the temptation to second-guess a lawyer's trial strategy." *Laws*, 863 F.2d at 1393 (quoting *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir.1987)). Even a losing strategy "may have been reasonable in the face of an unfavorable case." *Id.* at 1394 (emphasis removed) (quoting *Blackmon*, 825 F.2d at 1265).

Chambers attempts to formulate arguments based upon Hager's allegedly inadequate investigation. However, as the Seventh Circuit has observed:

When the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how, especially in the context of a habeas proceeding that collaterally attacks the state court conviction, the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result.

*United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir.1987).

Hager, trial counsel in Chamber's second trial, read the transcript of Jones' testimony in the first trial and concluded that it was more damaging than helpful. The only reason to interview Jones would have been to see if he would change his story. Hager decided not to interview Jones because even any substantial changes in his story would create an excessive danger of devastating impeachment. *Chambers v. State*, 745 S.W.2d at 720. Thus, although Chambers claims that he is challenging Hager's preparation, he is, in fact, attempting to challenge these strategic decisions by Hager.

My review of the record convinces me that both the state trial court and the district court properly assessed Jones' testimony. At the first trial, Jones testified that Chambers arrived in a car which was turned to face the exit of the parking lot. (Tr. first trial 748). As Chambers entered the building, the car was left running and was still occupied by the driver. (Tr. 748–49). Jones testified that he saw Chambers come out the door, get about half the distance of an automobile or truck, and turn half-way toward the door. (Tr. 738). Oestricker followed Chambers out the door and

struck Chambers hard enough to knock him down. (Tr. 738). Chambers then got up, took a step forward, and shot Oestricker. (Tr. 738). However, on cross-examination, Jones revealed that when Chambers walked out the door and turned around half-way, he already had a pistol in his hands, (Tr. 740), with the gun against his leg and positioned behind him, (Tr. 741). Oestricker was just emerging through the door when Chambers stopped, turned around with the gun in hand, and waited for Oestricker to come out. (Tr. 741–42). Jones testified that he had not seen Oestricker attempt to strike Chambers before Chambers initially took the gun out. (Tr. 742). According to Jones, after Chambers shot Oestricker, Chambers said either "[t]ake that tough guy," or "[t]ake that." (Tr. 742). After being shot, Oestricker made a grunting sound and backed up three or four steps. (Tr. 742). Chambers then walked toward him and slapped him in the head with the pistol "over and over again." (Tr. 742–43). Oestricker was standing about six feet away from Chambers at the time of the shot and was not moving toward Chambers. (Tr. 747). Jones also said that, after shooting Oestricker, Chambers walked into the building and asked "if anybody else wanted any of this." (Tr. 746). As he left the building, Chambers said to Oestricker, "Lay there and die." (Tr. 747).

Based upon this testimony, I cannot conclude that trial counsel acted in any unreasonably ineffective manner by deciding not to call Jones. Even if Jones' testimony supported a self-defense instruction, as the Supreme Court of Missouri held, the testimony also indicated that Chambers, with a pistol concealed against his leg, waited for Oestricker to come out the door and, after being struck, fired the fatal shot while Oestricker was six feet away and was not moving toward him. Chambers, after threatening the crowd in the bar, then ran to the car which had waited for him, with its motor running, during the entire incident.

While the question of whether there was evidence to support the giving of a self-defense instruction involves consideration of the evidence in the light most favorable to Chambers, a professional evaluation of the trial impact of the testimony involves consideration of that testimony in the light that the jury would consider it. This is a far broader analysis and I cannot conclude that Hager was unreasonably ineffective in his assessment of the impact of the Jones testimony on the jury. The Supreme Court has refused to find ineffective assistance where a lawyer did not introduce helpful evidence which, in turn, could have led to the introduction of other more harmful testimony. *See Burger,* 483 U.S. at 788–95, 107 S.Ct. at 3122–26; *Darden,* 477 U.S. at 184–87, 106 S.Ct. at 2473–75. The testimony of Jones presented just such a dilemma for Hager, and we should follow the teaching of the Supreme Court by refusing to conclude that there was ineffective assistance in this respect.

It is also important to consider the fact that, before the second trial, Chambers signed a statement in which he agreed with the decision not to call Jones. The Supreme Court stated in *Strickland* that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," 466 U.S. at 691, 104 S.Ct. at 2066, and that those statements are critical to a proper assessment of litigation decisions, *id.* When this statement is considered in combination with the content of Jones' testimony at the first trial, I am convinced that the decision not to call Jones was reasonable under *Strickland.*

Furthermore, even if the trial counsel should have called Jones, the *Strickland* test is not satisfied unless Chambers can also demonstrate "that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In order to prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is defined as one which is "sufficient to undermine confidence in the outcome." *Id.* After a thorough examination of the record, I conclude that there is not a reasonable probability that the introduction of

Jones' testimony would have changed the outcome of the second trial.

Accordingly, I would affirm the judgment of the district court denying the writ.

## ORDER

The panel opinion filed and judgment entered September 15, 1989 are vacated, and appellee's suggestion for rehearing en banc is granted. Counsel will be notified as to the time of oral argument. Counsel will each be given thirty days from the date of this order to file any supplemental briefs which are not duplicative of the briefs originally filed. The supplemental briefs shall not exceed fifteen pages.